**Slip Op. 07-51**


UNITED STATES COURT OF INTERNATIONAL TRADE


| | |
|---|---|
| FORMER EMPLOYEES OF INTERNATIONAL BUSINESS MACHINES CORPORATION, : <br><br> : <br> *Plaintiffs*, <br><br> : <br> v. <br><br> : <br> U.S. SECRETARY OF LABOR, <br><br> : <br> *Defendant.* | Court No. 04-00079 |

[Action remanded to Defendant for further proceedings not inconsistent with opinion. Judgement reserved as to consequences of Defendant's failure to comply with court's prior instructions.]

Dated: March 30, 2007

King & Spalding LLP (J. Michael Taylor, Christine E. Savage, Tina M. Shaughnessy, and Stephen A. Jones), for Plaintiffs.

Peter D. Keisler, Assistant Attorney General; Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Michael D. Panzera); Stephen R. Jones, Office of the Solicitor, U.S. Department of Labor, Of Counsel; for Defendant.


**OPINION**

RIDGWAY, Judge:

This action challenges the determinations of the U.S. Department of Labor denying the

petition for trade adjustment assistance ("TAA") filed by the plaintiff Former Employees,[1] who

---

[1]*See* Notice of Determinations Regarding Eligibility to Apply for Worker Adjustment Assistance, 69 Fed. Reg. 2,621, 2,622 (Jan. 16, 2004) ("Notice of Initial Denial"); Notice of Negative Determination Regarding Application for Reconsideration, 69 Fed. Reg. 20,644 (April 16, 2004) ("Notice of Denial of Reconsideration"); Notice of Negative Determination on

claim TAA benefits as "leased service workers," and who were employed for years by BP/Amoco,

before being "outsourced" to the consulting services group of Pricewaterhouse Coopers ("PwC"),

which was – in turn – acquired by IBM, before the Former Employees' termination.

Pending before the Court is the Labor Department's [Third] Notice of Negative

Determination on Remand, 41 Fed. Reg. 10,709 (March 2, 2006) (CSAR 1019-50; SAR 1019-50)

("Third Negative Redetermination on Remand"), which was filed pursuant to <u>Former Employees</u>

<u>of Int'l Bus. Mach. Corp.</u>, 29 CIT ____, 403 F. Supp. 2d 1311 (2005) ("<u>IBM I</u>").[2]  In its Third

Negative Redetermination on Remand, the Labor Department announced a new Leased Worker

Policy,  establishing seven criteria to be applied in cases – like this one – involving leased workers,

"to determine the extent to which a worker group engaged in activities related to the production of

---

Reconsideration on Remand, 69 Fed. Reg. 48,527 (Aug. 10, 2004) ("Notice of Second Negative Redetermination on Remand"); Notice of Negative Determination on Remand, 71 Fed. Reg. 10,709 (March 2, 2006) ("Third Negative Redetermination on Remand").

[2]As outlined in greater detail below, this action has been remanded to the Labor Department three times to date.  There are two separately-paginated administrative records – the initial Administrative Record (which includes the records of both the agency's initial investigation and its first voluntary remand investigation), and the Supplemental Administrative Record (which consists of the record of the second voluntary remand investigation, as well as that of the third remand investigation, which was ordered by <u>IBM I</u>).  Moreover, because confidential information is included in the file, there are two versions of each of the records – public and confidential.

Citations to the public versions of the Administrative Record and the Supplemental Administrative Record are noted as "AR ____" and "SAR ____," respectively.  Citations to the confidential versions are, in turn, noted as "CAR ____" and "CSAR ____."

The administrative record of the most recent remand proceeding – the third remand – begins at CSAR/SAR 270.  A redacted, public version of the Labor Department's most recent remand determination is published in the Federal Register, and is included in the record at SAR 1019-50. The complete, confidential version of that same determination appears in the record at CSAR 1019-50.

an article by a producing firm is under the operational control of the producing firm." *See* Third Negative Determination on Remand, 41 Fed. Reg. at 10,712. Concluding that all seven criteria weighed against the Former Employees here, the Labor Department reaffirmed its denial of TAA certification. *Id*. at 10,712-14; CSAR 1035-50.

The Former Employees challenge the Third Negative Redetermination on Remand, characterizing the Labor Department's remand investigation as "a sham, which lacked transparency and was conducted to reach a predetermined negative result." *See* Plaintiffs' Comments Concerning the Department of Labor's Negative Determination on Remand ("Pls.' Brief") at 1; *see also* Plaintiffs' Reply to Defendant's April 28, 2006 Response ("Pls.' Reply Brief") at 1-5. The Former Employees further contend that, contrary to the agency's determination, "substantial record evidence demonstrates that the Former Employees were under the operational control of BP," and that the Labor Department "has failed to identify any other certification requirements not supported by substantial evidence on the record." Pls.' Brief at 3; *see also* Pls.' Reply Brief at 8-9.

Accordingly, the Former Employees urge the Court to reverse the Third Negative Redetermination on Remand, and to order the Labor Department to certify the Former Employees as eligible to receive TAA benefits. In the alternative, the Former Employees ask that the Court remand this matter to the Labor Department after explicitly finding that the agency's determination as to operational control is not supported by substantial evidence and that the Former Employees' satisfaction of all other requirements for certification has been conceded. Pls.' Brief at 36; Pls.' Reply Brief at 1, 11.

For its part, the Government maintains that the Labor Department's Third Negative

Redetermination on Remand is supported by substantial evidence in the administrative record and is otherwise in accordance with law. The Government therefore contends that the agency's negative determination should be sustained in all respects. *See generally* Defendant's Response to Plaintiffs' Comments Upon Labor's Remand Determination ("Def.'s Brief").

Jurisdiction lies under 28 U.S.C. § 1581(d)(1) (2000).[3] For the reasons set forth below, this action is remanded to Defendant yet again, for further proceedings not inconsistent with this opinion, and judgement is reserved as to the consequences of Defendant's failure to comply with the Court's instructions in <u>IBM I</u>. *See*, *e.g.*, section IV.E, *infra*.

## I. <u>The Relevant Legal Framework</u>

Trade adjustment assistance has long served as the *quid pro quo* for U.S. national policies of free trade. *See generally* <u>Former Employees of BMC Software, Inc. v. U.S. Sec'y of Labor</u>, 30 CIT ____, ____, 454 F. Supp. 2d 1306, 1307-08 (2006) (*citing* <u>Former Employees of Chevron Prods. Co. v. U.S. Sec'y of Labor</u>, 27 CIT 1930, 1943-44, 298 F. Supp. 2d 1338, 1349-50 (2003) ("<u>Chevron III</u>")) (summarizing policy underpinnings of TAA laws). As <u>UAW v. Marshall</u> explains, "much as the doctrine of eminent domain requires compensation when private property is taken for public use," the TAA laws similarly reflect the country's recognition that "fairness demand[s] some mechanism whereby the national public, which realizes an overall gain through trade readjustments, can compensate the particular . . . workers who suffer a [job] loss. <u>UAW v. Marshall</u>, 584 F.2d 390, 395 (D.C. Cir. 1978).

---

[3]Except as otherwise noted, all statutory citations are to the 2000 edition of the United States Code.

Trade adjustment assistance is generally designed to assist workers who have lost their jobs as a result of increased import competition from – or shifts in production to – other countries,[4] by helping those workers "learn the new skills necessary to find productive employment in a changing American economy."  Former Employees of Chevron Prods. Co. v. U.S. Sec'y of Labor, 26 CIT

---

[4]Specifically, the TAA statute provides for the certification of workers where:

(1)     a significant number or proportion of the workers in such workers' firm, or an appropriate subdivision of the firm, have become . . . separated . . . ; and

(2)     (A)     (i)     the sales or production, or both, of such firm or subdivision have decreased absolutely;

                (ii)    imports of articles like or directly competitive with articles produced by such firm or subdivision have increased; and

                (iii)   the increase in imports described in clause (ii) contributed importantly to such workers' separation or threat of separation and to the decline in the sales or production of such firm or subdivision; or

        (B)     (i)     there has been a shift in production by such workers' firm or subdivision to a foreign country of articles like or directly competitive with articles which are produced by such firm or subdivision; and

                (ii)    (I)     the country to which the workers' firm has shifted production of the articles is a party to a free trade agreement with the United States;

                        (II)    the country to which the workers' firm has shifted production of the articles is a beneficiary country under the Andean Trade Preference Act . . . , African Growth and Opportunity Act . . . , or the Caribbean Basin Economic Recovery Act . . . ; or

                        (III)   there has been or is likely to be an increase in imports of articles that are like or directly competitive with articles which are or were produced by such firm or subdivision.

19 U.S.C. § 2272(a) (Supp. II 2002).

1272, 1273, 245 F. Supp. 2d 1312, 1317 (2002) ("Chevron I") (*quoting* S. Rep. No. 100-71, at 11

(1987)).[5]

As remedial legislation, the TAA laws are to be construed broadly to effectuate their

intended purpose. UAW v. Marshall, 584 F.2d at 396 (recognizing the "general remedial purpose"

of TAA statutes, and noting that "remedial statutes are to be liberally construed").[6] Moreover, both

"because of the *ex parte* nature of the certification process, and the remedial purpose of [the TAA

statutes], the [Labor Department] is obliged to conduct [its] investigation with the utmost regard for

the interests of the petitioning workers." Stidham v. U.S. Dep't of Labor, 11 CIT 548, 551, 669 F.

Supp. 432, 435 (1987) (*citing* Abbott v. Donovan, 7 CIT 323, 327-28, 588 F. Supp. 1438, 1442

(1984) (quotation marks omitted)); *see also* BMC, 30 CIT at ____, 454 F. Supp. 2d at 1312 (and

cases cited there).

Thus, although the Labor Department is vested with considerable discretion in the conduct

of its investigations of TAA claims, "there exists a threshold requirement of reasonable inquiry."

Former Employees of Hawkins Oil & Gas, Inc. v. U.S. Sec'y of Labor, 17 CIT 126, 130, 814 F.

---

[5]As expanded in 2002, the TAA program entitles eligible workers to receive benefits which may include employment services (such as career counseling, resume-writing and interview skills workshops, and job referral programs), vocational training, job search and relocation allowances, income support payments, and a Health Insurance Coverage Tax Credit. *See generally* 19 U.S.C. § 2272 *et seq.* (2000 & Supp. II 2002); BMC, 30 CIT at ____, 454 F. Supp. 2d at 1309-10.

[6]*See also* BMC, 30 CIT at ____, 454 F. Supp. 2d at 1311 (and cases cited there); Former Employees of Ameriphone, Inc. v. United States, 27 CIT ____, ____, 288 F. Supp. 2d 1353, 1355 (2003) (citations omitted); Former Employees of Electronic Data Sys. Corp. v. U.S. Sec'y of Labor, 28 CIT ____, ____, 350 F. Supp. 2d 1282, 1290 (2004) ("EDS I"); Former Employees of Champion Aviation Prods. v. Herman, 23 CIT 349, 352 (1999) (citations omitted) (NAFTA-TAA statute is remedial legislation, to be construed broadly); Chevron I, 26 CIT at 1274, 245 F. Supp. 2d at 1318 (citations omitted) (same).

Supp. 1111, 1115 (1993). Courts have not hesitated to set aside agency determinations which are

the product of perfunctory investigations.[7]

## II. **Background**

As detailed in IBM I, the events leading to this action stretch back more than a decade, and

include a corporate merger, the workforce reduction that followed that merger, the "outsourcing"

of the Former Employees, the acquisition of their new employer by another firm, and, ultimately,

their termination, followed by a growing line of determinations by the Labor Department denying

their petition for TAA certification. *See generally* IBM I, 29 CIT at ____, ____, 403 F. Supp. 2d

at 1313, 1319-23.

### A. The Facts of the Case

In some cases for up to 30 or 40 years prior to their termination, the Former Employees

worked in the oil and gas industry – supporting exploration, drilling, and production from the same

wells owned by the same oil company, doing the same tasks, day in and day out, seated at the same

desks, inside the same facility in Tulsa, Oklahoma (the "Accounting Center"). *See generally* IBM

I, 29 CIT at ____, ____, 403 F. Supp. 2d at 1313, 1319.

The Former Employees' initial employer, Amoco Corporation, merged with The British

Petroleum Company p.l.c. in December 1998, and – as a result – the Former Employees became

employees of BP Amoco Group (now known as BP p.l.c., or simply "BP"). The Former Employees

---

[7]*See*, *e.g.*, BMC, 30 CIT at ____ n.10, 454 F. Supp. 2d at 1312 n.10 (cataloguing numerous opinions criticizing Labor Department's handling of TAA cases); *see also id*., 30 CIT at ____, 454 F. Supp. 2d at 1352-54 (analyzing agency's overall "track record" before the court).

survived the layoffs that followed the 1998 merger. Their colleagues who were less fortunate were later certified as eligible to apply for TAA benefits, in 1999.[8] *See generally* IBM I, 29 CIT at ____, ____, 403 F. Supp. 2d at 1313, 1319.

In 2000, the Former Employees and others at the Accounting Center who had survived the post-merger reductions in force were struck by another wave of corporate restructuring, when BP "outsourced" their unit to Pricewaterhouse Coopers ("PwC"). Two years later, IBM acquired PwC's consulting services business, and the Former Employees became employees of IBM. *See generally* IBM I, 29 CIT at ____, ____, 403 F. Supp. 2d at 1313, 1319.

The Former Employees maintain that, although they were "outsourced" by BP, nothing ever really changed except the company signing their paychecks. The Former Employees attest that, even after their "outsourcing," the workers at the Accounting Center continued to work for BP – "managing oil and gas production and related leases, managing BP's production-related assets and equipment, accounting for various production plants, supporting division order operations, performing procurement functions, and submitting regulatory government reports on North American production." Indeed, according to the Former Employees, BP retained control over work done at the Accounting Center at all times, both as a matter of contract and as a matter of operational reality. *See generally* IBM I, 29 CIT at ____, ____, 403 F. Supp. 2d at 1313, 1319.

Although the Former Employees had successfully weathered repeated corporate shake-ups

---

[8]The Labor Department later determined that the workers laid off from the Accounting Center in 1998 had been "engaged in activities related to exploration and production of crude oil and natural gas," and were therefore entitled to TAA certification. That certification, in turn, was amended to reflect new ownership and another name change to BP/AMOCO Production Company, Inc. *See generally* IBM I, 29 CIT at ____, ____, 403 F. Supp. 2d at 1313, 1319.

in the past, their luck ran out in 2003, when they were terminated – a development which they trace to surging imports of oil and natural gas, as well as BP's shift from domestic to foreign production. *See generally* IBM I, 29 CIT at ____, ____, 403 F. Supp. 2d at 1313, 1319.

According to the Former Employees, at the time of their termination, they were still sitting at the same desks in the same building doing the same work for the same company in support of the same production facilities as their former colleagues who were laid off in 1998. Just as their colleagues laid off in 1998 had done, the Former Employees here filed a TAA petition. But the Former Employees' petition met a very different fate. *See generally* IBM I, 29 CIT at ____, ____, 403 F. Supp. 2d at 1313, 1319-20.

### B.  The Procedural History of the Case

In mid-November 2003, the Former Employees filed a petition with the Labor Department, seeking TAA certification. Within a week of the initiation of the investigation, their petition had been denied.[9]

### 1.  The Initial Denial and The First Voluntary Remand Proceeding

The Labor Department's first negative determination rested on the agency's conclusion that the Former Employees did not produce an "article" within the meaning of the TAA statute. Notice of Initial Denial, 69 Fed. Reg. 2,621.

---

[9]The Labor Department initiated its investigation on November 26, 2003. By December 2, 2003, it had already made a negative determination. *See* Notice of Investigations Regarding Certifications of Eligibility to Apply for Worker Adjustment Assistance, 68 Fed. Reg. 74,973, 74,975 (Dec. 29, 2003); Notice of Initial Denial, 69 Fed. Reg. 2,621 (Jan. 16, 2004); IBM I, 29 CIT at ____ n.14, 403 F. Supp. 2d at 1320 n.14.

As IBM I explained, it is difficult to understate the superficial nature of the Labor Department's initial investigation. Indeed, the entire "investigation" consisted of a single two-page questionnaire, sent to an IBM official. The agency posed two questions concerning whether IBM produced an article at the Accounting Center. Nowhere did the agency seek to elicit information concerning the Former Employees' potential eligibility for certification as service workers. And nowhere did the agency probe IBM's contractual relationship with any other company – even though, on their petition form, the Former Employees listed "IBM/BP Amoco" in the space provided for "Company Name," and explained elsewhere on the form that the "Accounting Center performs accounting services for BPAmerica/BP Amoco Oil." Based on the scant information before it, the Labor Department sent a letter to the Former Employees, informing them that their TAA petition had been denied. *See generally* IBM I, 29 CIT at ____, 403 F. Supp. 2d at 1321.

The Former Employees filed both a request for reconsideration with the Labor Department and a letter with this Court seeking judicial review (later deemed the Complaint). In light of the pendency of both a request for administrative reconsideration and a Summons and Complaint challenging the same TAA determination, the Government sought – and was granted – a voluntary remand. *See generally* IBM I, 29 CIT at ____, 403 F. Supp. 2d at 1321.

### 2. The First Negative Redetermination on Remand

One day after the case was remanded to the agency, the Labor Department issued the results of its investigation on remand – reaffirming its denial of the Former Employees' TAA petition, but on different grounds. This time, the negative determination was based primarily on the Labor Department's finding that the Former Employees were "service workers." According to the

agency's criteria then in place, service workers were eligible for TAA certification only if they were either "in direct support of an affiliated facility currently certified for TAA or employed on a contractual basis at a location currently certified for TAA."  Notice of Denial of Reconsideration, 69 Fed. Reg. at 20,644; *see generally* IBM I, 29 CIT at ____,  403 F. Supp. 2d at 1321.

The Labor Department concluded that the Former Employees did not meet the applicable criteria.  But the agency failed to consider whether the 1999 certification of the Former Employees' colleagues at the Accounting Center constituted evidence that the Former Employees – as service workers – had provided "direct support" to BP.  Moreover, the agency paid scant attention to the undisputed fact that the Former Employees were paid by BP prior to 1999, and that – notwithstanding their "outsourcing" – they had continued to perform the same work for BP up to the time of their discharge.  Notice of Denial of Reconsideration, 69 Fed. Reg. at 20,644-45; *see generally* IBM I, 29 CIT at ____, 403 F. Supp. 2d at 1321.[10]

### 3.  The Second Voluntary Remand Proceeding

Less than a month after the results of the initial remand were published, the Government sought a second, 60-day voluntary remand, prompted by a letter from the Court inquiring about inconsistencies in the Labor Department's articulation of the criteria for TAA certification of service

---

[10]The sole evidence cited to support the Labor Department's determination was a statement by an IBM official based in North Carolina, who reportedly told the agency that there was no affiliation between the Accounting Center and BP, and that IBM "provide[d] accounting services to [BP] at many locations in the United States and abroad out of [the Accounting Center]."  Notice of Denial of Reconsideration, 69 Fed. Reg. at 20,644-45.  Significantly, that same IBM official later disclaimed "any firsthand knowledge of daily work activities of the Former Employees," and recommended that "someone else at IBM should be contacted for additional information."  *See generally* IBM I, 29 CIT at ____, 403 F. Supp. 2d at 1321-22 (citation omitted).

workers. The Government explained that a second remand was necessary to permit the agency to apply a new interpretation of the service workers criteria, which clarified that service workers could be certified provided that the production workers that they supported were "certifiable" for TAA (*i.e.*, eligible for certification) – even if the production workers had not actually been certified. The Government further explained that, on remand, the Labor Department "intend[ed] to supplement the administrative record with additional evidence regarding the relationship" between the Accounting Center and BP. *See generally* IBM I, 29 CIT at ____, 403 F. Supp. 2d at 1322.

Over the course of the two months that followed, the Labor Department verified the existence of the Service Level Agreement ("SLA") between BP and PwC/IBM, under which employees at the Accounting Center continued to provide services to BP even after the outsourcing (although the agency failed to obtain a copy of the contract itself). Among other things, the Labor Department also learned that, although some IBM employees at the Accounting Center served some other companies, most of the work done at that location was for BP. *See generally* IBM I, 29 CIT at ____, 403 F. Supp. 2d at 1322-23.

#### 4. The Second Negative Redetermination on Remand

Ultimately, the Labor Department denied certification of the Former Employees yet again, citing three grounds for its determination. First, although the Former Employees had never even claimed to be production workers, the Labor Department concluded that they could not be so certified. In the course of explaining that determination, the agency dismissed as "immaterial" the 1999 certification of the Former Employees' former colleagues at the Accounting Center. Second, and most relevant here, the Labor Department concluded that the Former Employees could not be

certified as service workers because they were not under the "control" of BP. And, third, the agency

concluded that – even if the Former Employees had been under the control of BP – they still would

not be eligible for TAA benefits because they were not working in a BP production facility or in an

appropriate subdivision of such a facility. Notice of Second Negative Redetermination on Remand,

69 Fed. Reg. 48,527; *see generally* IBM I, 29 CIT at \_\_\_\_, 403 F. Supp. 2d at 1323. The Labor

Department's Second Negative Redetermination on Remand was the subject of IBM I. *Id.*

### 5. The Court's Decision in IBM I

Much of IBM I was devoted to the issue of "control." As IBM I noted, the Labor

Department's traditional test for TAA certification of service workers requires, in relevant part, that

the petitioning workers' separation be "caused importantly by a reduced demand for their services

from a parent firm, a firm otherwise related to the subject firm by ownership, or *a firm related by*

*control.*" *See* IBM I, 29 CIT at \_\_\_\_, 403 F. Supp. 2d at 1315 (*citing* Chevron I, 26 CIT at 1285,

245 F. Supp. 2d at 1328) (emphasis added).

IBM I explained that the Labor Department historically had interpreted "control" as limited

to "ownership and corporate voting control." *Id.*, 29 CIT at \_\_\_\_, 403 F. Supp. 2d at 1315 (*citing*

Former Employees of Pittsburgh Logistics Systems, Inc. v. U.S. Sec'y of Labor, 27 CIT 1301, 1312

(2003) ("Pittsburgh Logistics II")). But, as IBM I noted, Pittsburgh Logistics ruled that "control"

must be interpreted more expansively, to include not only corporate/legal control, but operational

control as well. *See* IBM I, 29 CIT at \_\_\_\_, 403 F. Supp. 2d at 1315-16 (*citing* Pittsburgh Logistics

II, 27 CIT at 1314-16,1318-20).

The workers in Pittsburgh Logistics had been terminated from their employment at an LTV

Steel Company facility in Independence, Ohio, after LTV ceased production. The <u>Pittsburgh</u> <u>Logistics</u> ("PLS") workers petitioned for TAA certification, asserting that they were a "PLS subdivision" of LTV consisting of former LTV workers who had been "outsourced" to PLS; "that they were under the *de facto* control of LTV"; and that their duties were essential to the production of steel at LTV facilities. *See* <u>IBM I</u>, 29 CIT at ____, 403 F. Supp. 2d at 1316 (*quoting* <u>Former</u> <u>Employees of Pittsburgh Logistics Systems, Inc. v. U.S. Sec'y of Labor</u>, 27 CIT 339, 341 (2003) ("<u>Pittsburgh Logistics I</u>")).

Although the Labor Department had certified workers at LTV's Cleveland plant (as well as certain workers at LTV's Independence facility), the agency initially denied the petition of the PLS workers, based in part on its finding that they were service workers and that their employer – PLS – was not related to LTV by ownership or "control." *See* <u>IBM I</u>, 29 CIT at ____, 403 F. Supp. 2d at 1316 (*citing* <u>Pittsburgh Logistics I</u>, 27 CIT at 340). But, based on the <u>Pittsburgh Logistics</u> court's more expansive interpretation of the term "control," and its determination that the PLS workers were indeed under the operational control of LTV, the Labor Department was ordered to certify the PLS workers as eligible for TAA benefits. <u>Pittsburgh Logistics II</u>, 27 CIT at 1318-20.

<u>Wackenhut</u> raised basically the same issues presented in <u>Pittsburgh Logistics</u>. *See* <u>Former</u> <u>Employees of Wackenhut Corp. v. U.S. Sec'y of Labor</u>, Court No. 02-00758. As <u>IBM I</u> explained, the Wackenhut Corporation had supplied BHP Copper, Inc. with workers who had provided security services at a BHP production facility in Arizona. Following lay-offs due to increased imports of copper cathodes and closure of the facility, the Labor Department certified BHP workers at the facility as eligible for TAA. But the agency twice denied the petition filed by the Wackenhut

workers.  *See* <u>IBM I</u>, 29 CIT at \_\_\_\_, 403 F. Supp. 2d at 1316.

As <u>IBM I</u> explained, applying the same narrow definition of "control" that it had applied in <u>Pittsburgh Logistics</u>, the Labor Department had concluded in <u>Wackenhut</u> that the workers could not be certified as service workers, because "Wackenhut and BHP are not controlled or substantially beneficially owned by the same persons."  *See* <u>IBM I</u>, 29 CIT at \_\_\_\_, 403 F. Supp. 2d at 1316-17 (*citing* The Wackenhut Corporation, San Manuel, AZ: Notice of Negative Determination on Reconsideration on Remand, 68 Fed. Reg. 47,097, 47,098 (Aug. 7, 2003) ("Wackenhut Notice of Denial on Reconsideration"); Notice of Determinations Regarding Eligibility to Apply for Worker Adjustment Assistance and NAFTA Transitional Adjustment Assistance, 67 Fed. Reg. 67,421 (Nov. 5, 2002)).

But – as <u>IBM I</u> noted – the issuance of <u>Pittsburgh Logistics II</u> turned the tide for the Wackenhut workers, resulting in their certification.  *See* <u>IBM I</u>, 29 CIT at \_\_\_\_, 403 F. Supp. 2d at 1317 (*citing* The Wackenhut Corp., San Manuel, AZ: Notice of Revised Determination, 69 Fed. Reg. 26,623 (May 13, 2004) ("Wackenhut Notice of Revised Determination")).  In January 2004, in response to <u>Pittsburgh Logistics</u> and similar cases, the Labor Department revised its policy on certification of so-called "leased" workers.  *See* <u>IBM I</u>, 29 CIT at \_\_\_\_, 403 F. Supp. 2d at 1317 (*citing* Labor Department Internal Memo re: New Leased Workers Policy (Jan. 23, 2004) (CSAR 261-62)).  It was that January 2004 policy which was at issue in <u>IBM I</u>.

According to the Labor Department's January 2004 memorandum, which specifically referenced <u>Wackenhut</u>, "the existence of a standard contract between the contractor firm [*i.e.*, the leased workers' employer] and the subject firm [*i.e.*, the company producing the trade-impacted

article] . . . should be considered sufficient evidence to prove the existence of a joint employer relationship." *See* <u>IBM I</u>, 29 CIT at \_\_\_\_, 403 F. Supp. 2d at 1317 (*quoting* Labor Department Internal Memo re: New Leased Workers Policy (CSAR 261-62)).[11]  Significantly, however, the January 2004 memorandum did not identify operational (or other) "control" as a requirement for certification of leased workers.  Moreover, although the January 2004 memorandum specified that – to be eligible for certification – leased workers "must perform their duties onsite at the affected location," no rationale for that requirement was stated.  *See* <u>IBM I</u>, 29 CIT at \_\_\_\_ & n.10, 403 F. Supp. 2d at 1317-18 & n.10 (*citing* Labor Department Internal Memo re: New Leased Workers Policy (CSAR 261-62)).

<u>IBM I</u> observed that the Labor Department's Second Negative Redetermination on Remand denied the Former Employees' claim in part because they were not under the control of BP.  *See* <u>IBM I</u>, 29 CIT at \_\_\_\_, 403 F. Supp. 2d at 1325-26 (*citing* Notice of Second Negative Remand Determination, 69 Fed. Reg. 48,527).  Noting that the Labor Department had applied a restrictive definition of control, <u>IBM I</u> affirmed that – in light of <u>Pittsburgh Logistics</u> – the Labor Department was required to define control more broadly, to include operational control.  *See* <u>IBM I</u>, 29 CIT at \_\_\_\_, 403 F. Supp. 2d at 1325-28.[12]

---

[11]As <u>IBM I</u> noted, the January 2004 memorandum said little about the concept of a "joint employer" relationship – other than the passing reference quoted above – except to incorporate by reference another memorandum (missing from the record of this case) which apparently discusses that concept at greater length.  *See* <u>IBM I</u>, 29 CIT at \_\_\_\_, 403 F. Supp. 2d at 1318 (citation omitted).

[12]As an aside, <u>IBM I</u> observed that, although both the Labor Department and the Former Employees apparently assumed that the Former Employees are eligible for certification only if they were under the control of BP, the January 2004 Leased Worker Policy did not identify "control" as a certification requirement.  <u>IBM I</u> further noted that it is unclear whether, as a matter of practice,

Moreover, IBM I found that the then-existing record included "relatively ample evidence supporting the Former Employees' claims that – as a practical matter – BP continued to exercise management and operational control over their work up to the time of their termination." *See* IBM I, 29 CIT at ____, 403 F. Supp. 2d at 1329; *see generally id*., 29 CIT at ____, 403 F. Supp. 2d at 1328-37.  In contrast, IBM I noted, there was at best "only minimal evidence that, at the time of their determination, the Former Employees were under the operational control of IBM." *Id*., 29 CIT at ____, 403 F. Supp. 2d at 1329.  IBM I further observed that "the relatively little evidence that support[ed] the agency's position [on control] consist[ed] of mere conclusory assertions (generally by IBM officials) and/or statements . . . contradicted by other record evidence that the Labor Department . . . failed to address." *Id*.

Accordingly, IBM I directed:

On remand, the Labor Department shall reevaluate the existing record evidence on the issue of "control" . . . , and shall conduct such further investigation of the relevant facts as is necessary to fully develop the evidentiary record (including solicitation of additional information from the Former Employees, among others).

IBM I, 29 CIT at ____, 403 F. Supp. 2d at 1335-36.  IBM I further required the agency, on remand, to "clearly articulate and apply a standard for 'control' . . . consistent with [the] opinion (clarifying and updating that set forth in its [January 2004] Leased Workers Policy)," and to detail the rationale for its standard.  *Id*., 29 CIT at ____, 403 F. Supp. 2d at 1336-37.

Finally, IBM I emphasized that the facts of the case at bar are "particularly compelling, because – much like Pittsburgh Logistics, and in contrast to the more typical 'leased workers' case

---

the agency consistently required evidence of control in cases in which the January 2004 policy was applied. *See* IBM I, 29 CIT at ____ n.18, 403 F. Supp. 2d at 1327 n.18.

like Wackenhut (where the workers had no pre-existing relationship with the company producing

the trade-impacted article) – the Former Employees in this case were employed directly by BP until

they (and their work) were 'outsourced.'" IBM I, 29 CIT at _____ n.20, 403 F. Supp. 2d at 1328

n.20. IBM I therefore mandated that, on remand:

> [I]n both its articulation and its application of its policy vis-a-vis TAA certification
> of leased workers, the Labor Department should recognize and reflect (for purposes
> of its analysis of "control") the difference between standard, run-of-the-mill leased
> workers cases (where there was no pre-existing relationship between the leased
> workers and the company producing the trade-impacted article) *versus* cases – like
> this one – where the petitioning workers were "outsourced" by their initial employer
> and then immediately leased directly back to that company, as part of an outsourcing
> strategy.

IBM I, 29 CIT at _____ n.38, 403 F. Supp. 2d at 1336 n.38.

As an alternative ground for denying certification, the Second Negative Redetermination on

Remand concluded that – even if BP exercised  control over the Former Employees – they

nevertheless could not be certified, because they were not "co-located with BP workers at a BP

facility that produces an article." IBM I, 29 CIT at _____, 403 F. Supp. 2d at 1337 (*citing* Notice of

Second Negative Redetermination on Remand, 69 Fed. Reg. at 48,528); *see generally id*., 29 CIT

at _____, 403 F. Supp. 2d at 1337-42. Therefore, in addition to analyzing the issue of "control," IBM

I also reviewed the Labor Department's treatment of the location of the Former Employees'

workplace.

IBM I found that the Labor Department's "so-called 'location requirement'" defied

"meaningful judicial review," both because the agency had "failed to articulate the legal and policy

bases for its position (or, frankly, even to adequately explain exactly what that position [was])," and

because the evidentiary record that the agency had compiled on the issue was "anemic." IBM I, 29

CIT at \_\_\_\_, 403 F. Supp. 2d at 1338.[13]  IBM I therefore required that:

> [O]n remand, the Labor Department shall (1) clearly articulate and explain the significance of any "co-location" criterion for TAA certification (and its relationship to other elements of any "location requirement"), as well as the distinctions – if any – that the agency draws between different classes of workers . . .; (2) adequately justify its position as a matter of law and policy (bearing in mind, *inter alia*, the remedial purpose of the TAA statute); and (3) explain whether, and to what extent, the agency's actual practice in the application of the "co-location" criterion – in this and other cases – has been consistent with the position that it is espousing here.

IBM I, 29 CIT at \_\_\_\_ & n.39, 403 F. Supp. 2d at 1337-38 & n.39.  IBM I further directed that, "to the extent that the Labor Department continues to adhere to the 'co-location' criterion, the agency shall – on remand – reconsider its [negative] finding on 'co-location' in this matter and ensure that its determination is supported by substantial evidence in the record." *Id*.

IBM I concluded by observing that, in its Second Negative Redetermination on Remand, the Labor Department had failed to reach determinations on all applicable criteria for certification. *See* IBM I, 29 CIT at \_\_\_\_, 403 F. Supp. 2d at 1345.  Noting the existence of "confusion as to precisely how the agency's classic test for certification as 'service workers' [was] to be interpreted and applied in light of the agency's [January 2004] Leased Worker Policy," IBM I directed that:

> On remand, the Labor Department shall spell out with precision all criteria applicable to the Former Employees' potential certification as leased service workers . . . (including any revisions or clarifications of that policy in the course of the remand).  In addition, the Labor Department shall explain the origins of and legal bases for all such criteria.

IBM I, 29 CIT at \_\_\_\_, 403 F. Supp. 2d at 1345-47; *see also id*., 29 CIT at \_\_\_\_ n.38, 403 F. Supp.

---

[13]IBM I also expressed the view that – rather than constituting a distinct criterion, separate and apart from "control" – location might be more properly treated as an indicia of "control." *See* IBM I, 29 CIT at \_\_\_\_ n.44, 403 F. Supp. 2d at 1339 n.44.

2d at 1336 n.38 (mandating that agency include in the record on remand "a complete, self-contained statement articulating all agency criteria for TAA certification of leased workers"). IBM I further instructed the Labor Department to "make determinations as to whether each of the criteria [for certification of leased workers] is satisfied in this case," and encouraged the agency "to engage in full and candid consultations with the Former Employees on all issues." *Id*., 29 CIT at ____, 403 F. Supp. 2d at 1347.

### 6. The Third Remand Proceeding

In the course of the third remand proceeding, the Labor Department began – incredibly, for the first time – to seriously probe the merits of the Former Employees' petition for TAA certification. As the Former Employees candidly acknowledge, "Labor dedicated much more time to contacting and questioning IBM and BP representatives during this remand investigation than it had in any of the prior investigations undertaken in this case." Pls.' Brief at 7.

The Labor Department obtained a copy of the contract between BP and PwC/IBM. *See* CSAR 396-719. The agency also sent a total of five sets of questions to IBM,[14] and three sets to BP.[15] The agency's questions focused primarily on the issue of control, though a few were

---

[14]*See generally* CSAR 730-32 (first set of questions), 720-24, 753 (first set of responses), 750-52 (second set of questions), 733-37 (second set of responses), 767-68 (third set of questions), 754–57 (third set of responses), 758-60 (fourth set of questions), 972-76 (fourth set of responses), 781-83 (fifth set of questions), 788-92 (fifth set of responses). In addition, the Labor Department asked IBM several supplemental or follow-up questions. *See*, *e.g.*, CSAR 764 (not clear whether response is included in the record), 793.

[15]*See generally* CSAR 808-09 (first set of questions), 812-14 (first set of responses), 826-28 (second set of questions), 814-18 (second set of responses), 839-42 (third set of questions), 843-46, 848 (third set of responses). The Labor Department also posed supplemental or follow-up questions to BP. *See* CSAR 837-38.

addressed to the circumstances that led to the termination of the Former Employees. *See*, *e.g.*, CSAR 732, 809.[16] In addition, the Labor Department provided IBM with "the statements of the workers and their responses," and requested IBM's comments concerning "the accuracy of the[] [Former Employees'] statements and whether there are actual facts supporting [the Former Employees'] allegations." CSAR 786.[17]

Further, the Labor Department held two conference calls with IBM officials to discuss issues raised in the investigation, and convened at least one such call with officials of BP. *See generally* CSAR 742, 761-62, 993-94; *see also* CSAR 852. Although counsel for the Former Employees asked to participate in the agency's teleconferences with BP and IBM, they were never included. *See* CSAR 997 at n.1. The teleconferences were memorialized for the administrative record by the agency investigator in summary memoranda; but the completeness of those memoranda is in doubt. *See generally* section IV.D.2.a(3), *infra*.

---

[16]As discussed in greater detail below, the Former Employees expressed concern at the time about the form of the agency's questions, and the lack of context for questions seeking to probe the issue of control. *See*, *e.g.*, CSAR 859 (expressing concern that responses of IBM and BP may be affected "as a result of the way in which Labor framed the questions"), 946 (criticizing agency for failure to provide context/definition of "control" in questions), 995 ("As we have discussed by telephone, we believe that most of the inconsistencies are the result of the record not reflecting the definition of control that Labor provided to IBM and BP for purposes of answering Labor's questions."); s*ee generally* n.56, *infra* (discussing Former Employees' objections to agency's use of "leading" questions); section IV.D.2.b, *infra* (discussing lack of definition of "control" in agency questions).

There is thus no truth to the Government's assertion that "at no time during the administrative proceeding did plaintiffs contend that any of the questions Labor asked was irrelevant or misleading." *See* Def.'s Brief at 25.

[17]From the record, it is not clear precisely what the Labor Department transmitted to IBM. Nor is it clear from the record whether IBM ever responded.

In the course of the remand investigation, the Labor Department sent questions to the Former Employees as well, and provided their counsel with a copy of the contract between BP and PwC/IBM.[18] In addition to responding to the agency's inquiries, the Former Employees took the initiative to provide the Labor Department with other information relevant to their claims. *See*, *e.g.*, CSAR 913-14, 942-51. The agency investigator also had several phone conversations with counsel for the Former Employees, discussing the substantive merits of the Former Employees' case. *See*, *e.g.*, SAR 904.

However, the record reveals that the Labor Department never truly embraced IBM I's recommendation to "engage in full and candid consultations with the Former Employees on all issues." *See* IBM I, 29 CIT at ____, 403 F. Supp. 2d at 1347.[19] For example, although the Labor Department contacted IBM and BP as early as the week of December 7 and forwarded questions to the two companies as early as December 12 (*see*, *e.g.* CSAR 730, 808), the agency did not engage counsel for the Former Employees for the first time until December 23 – the Friday before Christmas. *See* CSAR 853; *see generally* CSAR 851, 856-57, 859 (documenting early efforts by counsel for the Former Employees to reach out to agency); Pls.' Brief at Exh. 1 (same). Then, at 3:30 p.m. on December 23, with virtually no advance notice to the Former Employees or their

---

[18]*See generally* CSAR 853-54 (first set of questions), 859-61 (first set of responses), 899J-903 (second set of questions), 913-21 (second set of responses), 995-1000 (third set of questions, with responses); *see also* CSAR 864 (transmitting BP-PwC/IBM contract), 922 (transmitting BP-PwC/IBM Service Level Agreement).

[19]Though the events largely speak for themselves, the Government and the Labor Department strive to cast a rather different light on the chronology of, and certain developments in, the investigation. *See*, *e.g.*, Def.'s Brief at 25-27 and attached declarations of agency investigators. Whatever may have been the agency's intent, the effects on the Former Employees were the same.

counsel, the agency forwarded questions to be answered by the Former Employees, imposing a deadline of December 30. *See* CSAR 853, 859.

Moreover, the Labor Department agreed to forward for review by counsel for the Former Employees copies of the agency's questions to IBM and BP, as well as the companies' answers. But, although it later relented, the agency initially took the position that it would provide counsel for the Former Employees with copies of the companies' *answers* only *after* all information had been obtained from those sources. *See* CSAR 855, 857, 859. Further, particularly in the early stages of the investigation, the agency was slow to forward even copies of the BP and IBM *questions* to counsel for the Former Employees. *See generally* Pls.' Brief at 9.[20]

But what the Former Employees found most troubling was that the Labor Department never identified for them the criteria that it would apply to decide their fate until the agency issued its Third Negative Redetermination on Remand denying certification once again. *See generally* section IV.C, *infra*.

### 7. The Third Negative Redetermination on Remand

The Labor Department's Third Negative Redetermination on Remand both articulated a new, seven-criteria test for the "control" of leased workers, and applied that test to the Former Employees,

---

[20]Although the Labor Department provided counsel for the Former Employees with copies of the questionnaire responses of IBM and BP, the agency instructed counsel that those responses were confidential and therefore could not be shared with the Former Employees themselves. Thus, while IBM and BP had free access to the statements of the Former Employees, the Former Employees had no opportunity to review and comment on the factual representations made by their former employers, and counsel for the Former Employees was deprived of that potentially critical input. *See generally* Pls.' Brief at 26 n.9.

reaffirming the agency's prior denials of TAA certification. *See* Third Negative Redetermination on Remand, 71 Fed. Reg. 10,709-14, CSAR 1019-50.

According to the Labor Department, it sought on remand to "focus on articulating and applying objective criteria" for the exercise of operational control. Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,712. After reviewing the agency's prior Leased Worker Policy (set forth in its January 2004 memorandum), the agency determined that it was "appropriate to revise that policy, as an interim response to the issues raised in [the instant] proceeding, so that DOL policy more fully reflects potential real-world situations." *Id.* The Labor Department nevertheless noted that it expressly "retains the discretion to further revise [the] policy, so that the subject of 'operational control' can continue to receive close scrutiny as DOL undertakes rulemaking to update the regulations implementing the eligibility requirements of the Trade Act." *Id.*

The Labor Department advised that, "in response to the CIT's remand instructions," it had "re-evaluated the significance of a standard contract between the contractor firm and the subject firm." Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,712. The agency reasoned that, "[g]iven the Department's focus on ascertaining *operational*, rather than formal, control," "the existence of a contract between the employer (such as a staffing agency, leasing agency or contractor) of a worker group and a producing firm is not an essential pre-requisite for the Department to determine that the workers in question are, in effect, joint employees or leased workers of the producing firm." *Id.* Under the agency's new rationale, "[t]he presence or absence of a contract would simply be one element, albeit an important one, in the Department's analysis."

*Id.*[21]  The agency also emphasized that, "[i]n all situations," terminated leased workers "must still

have been engaged in activities related to production of an article produced by a firm" to be eligible

for certification.  *Id.*

The Third Negative Redetermination on Remand stated that the Labor Department had

reviewed various relevant legal authorities, to develop seven criteria to be applied "to determine the

extent to which a worker group engaged in activities related to the production of an article by a

producing firm is under the operational control of the producing firm."  *See* Third Negative

Redetermination on Remand, 71 Fed. Reg. at 10,712.  Noting that "[t]he body of law involving joint

employment or independent contractor status is complex and difficult to apply," the agency

explained that it had "sought to distill that body of law into some basic principles, thus creating a

test that is useable within the short statutory timeframes that govern TAA investigations."  *Id.*

The seven criteria outlined in the Third Negative Redetermination on Remand are:

1.      Whether the subject workers were on-site or off-site of a facility of a
        production firm.[22]

---

[21]According to the Labor Department: "While a contract, where one exists, may provide
strong evidence about the intended nature of the employment relationships between two firms, the
Department will also review the operational conditions in which workers of an independent firm
perform their functions for a producing firm."  *See* Third Negative Redetermination on Remand, 71
Fed. Reg. at 10,712.

[22]In the Third Negative Redetermination on Remand, the Labor Department noted that –
although the January 2004 Leased Worker Policy provided for the certification of *on-site* leased
workers only – "there may be circumstances where *off-site* leased workers . . . who provide support
for production at a trade-impacted facility can satisfy the 'operational control' criteria to be eligible
for TAA benefits."  Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,712-13
(emphasis added).

The Labor Department determined that "co-location, while an important consideration [in
determining control] . . . , is not the conclusive factor."  Third Negative Redetermination on

2.     Whether the subject workers performed tasks that were part of the producing firm's core business functions, as opposed to independent, discrete projects that were not part of the producing firm's core business functions.

3.     Whether the production firm has the discretion to hire, fire and discipline subject workers.[23]

4.     Whether the production firm exercises the authority to supervise the subject workers' daily work activities, including assigning and managing work, and determining how, where, and when the work of individual workers takes place. Factors such as the hours of work, the selection of work, and the manner in which the work is to be performed by each individual are relevant.

5.     Whether the services of the worker group have been offered on the open market (*e.g.*, do workers of the subject group perform work that supports other clients?).[24]

6.     Whether the production firm has been responsible for establishing wage rates and the payment of salaries to individual workers of the subject worker group.

7.     Whether the production firm has provided skills training to subject workers.[25]

---

Remand, 71 Fed. Reg. at 10,713. According to the agency, under the newly-articulated policy, "co-location" in effect "create[s] a strong presumption of control, so long as the workers are not engaged in activities completely unrelated to the work of the facility, such as selling extraneous items (*e.g.*, food) on-site and so long as other evidence does not demonstrate that the workers worked independently of the producing firm." *Id.*; *see also* 71 Fed. Reg. at 10,711 n.2 (employment at a production facility no longer a requirement for TAA certification).

[23]The Labor Department highlighted "[t]he discretion to hire, fire and discipline workers" as a "strong indicator of the level of control exercised by a producing firm on the employees of another firm." Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,713.

[24]According to the Labor Department, the fifth criterion – whether "workers of the subject group perform work that supports other clients" – is "another strong indicator" of control. *See* Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,713-14.

[25]The Third Negative Redetermination on Remand identifies the seventh criterion – the provision of training – as yet "another strong indicator" of control. *See* Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,714.

Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,712 (footnotes added).

According to the Labor Department, none of the seven factors is "dispositive." Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,712. Moreover, the agency recognized "that there may be cases in which evidence of every one of the criteria is not available." *Id*. Thus, the Labor Department indicated, in applying the new test, it intends to "look at such evidence as there is that goes to all these factors and . . . determine whether, on balance, the evidence supports a level of control by the producing firm that demonstrates that the workers of the contractor or secondary firm are, in fact, leased workers or joint employees of both firms." *Id*.

After setting forth its new, seven-criteria test for control, the Labor Department applied that test to the Former Employees. *See* Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,712-14, CSAR 1035-50. According to the Third Negative Redetermination on Remand, the agency "made every effort to explore whether the [Former Employees] were under the operational control of BP as the first step in determining if they are entitled to certification." Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,711.

"In order to determine who exercised actual, operational control" over the Former Employees, the Labor Department looked to the BP-PwC/IBM contract "as a starting point, not the endpoint, for its inquiries." Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,711. The agency stated that, through its inquiries, it "sought to develop a true understanding of the 'real-world' relationship between [the Former Employees], IBM management, and BP employees/management." *Id*.

The Labor Department thus "sought to determine what constitute the 'practical realities' .

. . of the relationship between [the Former Employees] and BP," by "[a]pplying the [seven, newly-established] criteria [for control] to the record evidence." Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,712. The Labor Department acknowledged that "the petitioners, but not necessarily all former IBM employees at the Tulsa facility, had been BP employees prior to being outsourced in 2000 and that the outsourcing did not result in changes to their work assignments." *Id*., 71 Fed. Reg. at 10,711. The agency further conceded that "IBM's acquisition of PwC had no impact on the petitioners' work assignments." *Id*. In addition, the agency noted that "in 1999, the Department certified accountants formerly employed by BP in Tulsa as eligible for TAA because their work had been performed in support of trade-impacted production activity at BP facilities." *Id*.

Nevertheless, reviewing each of its seven new criteria for control in turn, the Labor Department concluded that all of them weighed against the Former Employees. Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,712-14, CSAR 1035-50. The agency therefore "affirm[ed] [its] original notice of negative determination of eligibility," denying certification of the Former Employees. Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,714.

Although IBM I expressly instructed the Labor Department on remand to "spell out with precision *all criteria* applicable to the Former Employees' potential certification as leased service workers" (IBM I, 29 CIT at ____, 403 F. Supp. 2d at 1345-47 (emphasis added); *see also id*., 29 CIT at ____ n.38, 403 F. Supp. 2d at 1336 n.38), the Third Negative Redetermination on Remand addressed only the test for "control."

IBM I similarly directed the Labor Department on remand to "make determinations as to

whether each of the criteria [for certification of leased workers] is satisfied in this case." IBM I, 29 CIT at ____, 403 F. Supp. 2d at 1347. The Third Negative Redetermination on Remand stated in passing that IBM's 2003 Annual Report "documented the manner in which IBM 'rebalanced' its staffing after acquiring PwC," and asserted that the information in the annual report "corroborates other record evidence which indicates that the staffing reductions at IBM's Tulsa Accounting Center had nothing to do with BP." Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,711 n.3. And, elsewhere, the Third Negative Redetermination on Remand stated that "[t]he reasons that led to the layoffs [of the Former Employees' ex-colleagues] in 1999 [were] simply different from those present in 2003," so that "even if [the Former Employees] were deemed to be under BP's control, they could not be certified." Id., 71 Fed. Reg. at 10,711. However nowhere did the Labor Department make a formal determination on any criteria for certification other than control. Instead, immediately following the analysis of the seven newly-articulated criteria for control of leased workers, the Third Negative Redetermination on Remand reaffirmed the agency's denial of the Former Employees' TAA petition.

Thus, as discussed in greater detail below, in these and other major respects, the Labor Department's Third Negative Redetermination on Remand failed to comply with the mandate of IBM I.

### III. Standard of Review

Judicial review of a Labor Department determination denying certification of eligibility for trade adjustment assistance benefits is confined to the administrative record. See, e.g., Former Employees of Chevron Products Co. v. U.S. Sec'y of Labor, 27 CIT 1135, 1142, 279 F. Supp. 2d

1342, 1350 (2003) ("Chevron II") (citations omitted). The agency's determination must be sustained

if it is supported by substantial evidence in the record and is otherwise in accordance with law. 19

U.S.C. § 2395(b); Former Employees of Shaw Pipe, Inc. v. U.S. Sec'y of Labor, 21 CIT 1282, 1284-

85, 988 F. Supp. 588, 590 (1997) (citations omitted); Former Employees of Merrow Mach. Co. v.

U.S. Sec'y of Labor, 18 CIT 17, 18-19, 843 F. Supp. 1480, 1481 (1994) (citations omitted).

The Labor Department's findings of fact are thus conclusive if they are supported by

substantial evidence. *See* Former Employees of Galey & Lord Indus., Inc. v. Chao, 26 CIT 806,

808-09, 219 F. Supp. 2d 1283, 1285-86 (2002) (citations omitted); Merrow Mach. Co., 18 CIT at

19, 843 F. Supp. at 1481 (*citing* 19 U.S.C. § 2395(b)). "However, substantial evidence is more than

a 'mere scintilla'; it must be enough to reasonably support a conclusion." Chevron II, 27 CIT at

1143, 279 F. Supp. 2d at 1349 (*citing* Galey & Lord Indus., 26 CIT at 808, 219 F. Supp. 2d at 1286

(citations omitted)).

Moreover, the evidence on which the agency relies does not exist in a vacuum. Thus, to

determine whether substantial evidence exists, the record compiled by the agency must be reviewed

"in its entirety, including all evidence that 'fairly detracts from the substantiality of the evidence.'"

Consol. Bearings Co. v. United States, 412 F.3d 1266, 1269 (Fed. Cir. 2005) (citations omitted); *see*

*also* Gerald Metals, Inc. v. United States, 132 F.3d 716, 720 (Fed. Cir. 1997) ("[T]he substantiality

of evidence must take into account whatever in the record fairly detracts from its weight." (citations

omitted)); Chevron II, 27 CIT at 1143, 279 F. Supp. 2d at 1350 ("[A]n assessment of the

substantiality of record evidence must take into account whatever else in the record fairly detracts

from its weight." (citations omitted)).

Finally, all rulings based on the agency's findings of fact must be "in accordance with the statute and not . . . arbitrary and capricious"; to that end, "the law requires a showing of reasoned analysis." Former Employees of Gen. Elec. Corp. v. U.S. Dep't of Labor, 14 CIT 608, 611 (1990) (*quoting* UAW v. Marshall, 584 F.2d at 396 n.26).

In short, although it is clear that the scope of judicial review is narrow, and that a court is not free to substitute its judgment for that of the agency, it is equally clear that "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Former Employees of Alcatel Telecomms. Cable v. Herman, 24 CIT 655, 658-659 (2000) (*quoting* Motor Vehicle Mfr.'s Ass'n v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983) (citations omitted)).

Where good cause is shown, a case may be remanded to the Labor Department for further investigation and analysis. 19 U.S.C. § 2395(b); *see also* Former Employees of Motorola Ceramic Products v. United States, 336 F.3d 1360, 1362 (Fed. Cir. 2003) (citations omitted). Moreover, where circumstances warrant, the agency may be ordered to certify a group of workers, as "a remedy of last resort." *See* Pittsburgh Logistics II, 27 CIT at 1310, 1320 (ordering certification where agency "continue[d] to adhere to a discredited position . . . at odds with the developed facts of record").[26]

---

[26]*See also* United Electrical, Radio and Machine Workers of America v. Martin, 15 CIT 299, 308-09 (1991) (ordering certification of workers where agency used "protean reasoning to force its negative determination to fit whatever new facts come to light"); Former Employees of Hawkins Oil & Gas, 17 CIT at 130-31, 814 F. Supp. at 1115-16 (ordering certification where "another remand . . . would be futile"); Former Employees of Barry Callebaut v. Herman, 26 CIT 1044, 1058, 240 F. Supp. 2d 1214, 1228 (2002), *rev'd on other grounds*, 357 F.3d 1377 (Fed. Cir. 2004) (ordering certification where agency "failed to conduct an adequate investigation after four opportunities");

## IV.  **Analysis**

The Former Employees challenge the Labor Department's Third Negative Redetermination on Remand – including its new Leased Worker Policy – on a number of grounds, substantive and procedural.

The threshold question is whether the Former Employees' TAA petition is properly subject to the Labor Department's new Leased Worker Policy.  The validity of that new policy, and the sufficiency of the agency's articulated rationale, are also at issue.

---

Former Employees of Marathon Ashland Pipeline LLC v. Chao, 27 CIT 820, 837, 277 F. Supp. 2d 1298, 1312-13 (2003), *rev'd on other grounds*, 370 F.3d 1375 (Fed. Cir. 2004) (ordering certification after multiple remands, where "[n]othing in the record indicates that [the company] will be more forthcoming if the court were to remand again" and "[n]othing in the record indicates that Labor has the resources or willingness to conduct an investigation beyond making inquiries" of the company).

The Government has argued in recent years that the Court lacks the authority to order certification.  *See* Def.'s Brief at 14, 63-65; BMC, 30 CIT at ____ n.67, 454 F. Supp. 2d at 1347 n.67.  To date, the Court of Appeals has side-stepped the issue.  *See* Former Employees of Marathon Ashland Pipe Line LLC v. Chao, 370 F.3d 1375, 1386 (Fed. Cir. 2004) (finding, under the circumstances, "no occasion to address the government's argument that the remedy ordered by the [Court of International Trade] was outside [its] authority"); Former Employees of Barry Callebaut v. Chao, 357 F.3d 1377, 1383 (Fed. Cir. 2004) (deeming moot "the question of the Court of International Trade's authority to order Labor to certify [workers]" for TAA benefits).

Indeed, the workers in Barry Callebaut specifically cautioned the Court of Appeals against writing the Labor Department a "blank check":  "If Labor were correct that the Court of International Trade could do nothing other than affirm or remand, . . . the court would be powerless to do anything more than order a potentially endless series of futile remands, no matter how many times Labor failed to perform an adequate investigation" – "an 'absurd result.'" 357 F.3d at 1382-83.  *Cf.* Nippon Steel Corp. v. United States, 458 F.3d 1345, 1359 (Fed. Cir. 2006) (pointedly declining to endorse Government's claim that 19 U.S.C. § 1516a precludes Court of International Trade from reversing agency determinations in international trade cases and allows Court only to affirm or remand; emphasizing that "[i]t may well be that, in another situation, the trade court may be faced with [an agency] determination that is unsupported by substantial evidence, and for which a remand would be 'futile.'").

Other arguments go to the Labor Department's substantive analysis of the specific facts of this case. The Former Employees claim that the remand investigation was lacking in transparency, and designed to reach a predetermined outcome. They also dispute the reliability of much of the evidence on which the agency relies, and they maintain that the agency simply ignored evidence contrary to its determination.

In addition, the Former Employees contend that a criterion-by-criterion review of the existing record under the Labor Department's new policy demonstrates that they were indeed subject to BP's "operational control," and that the agency's determination to the contrary is unsupported by substantial evidence in the record. The Former Employees further contend that, because the agency failed to make determinations on any certification criteria other than control, their satisfaction of those criteria should be deemed conceded. The Former Employees conclude that – under the circumstances presented here – a fourth remand would be inappropriate, and court-ordered certification is the only just remedy.

Each of the Former Employees' challenges to the Labor Department's Third Negative Redetermination on Remand is considered below, in turn.

A. The Potential Applicability of the Agency's Prior Leased Worker Policy

As a threshold matter, the Labor Department apparently takes it as a given that the Former Employees' TAA claim is subject to the seven newly-articulated criteria for "control" set forth in the agency's latest Leased Worker Policy. But the issue is far from clear.[27]

_____

[27]IBM I did not instruct the Labor Department to develop an *entirely new* Leased Worker Policy or an *entirely new* definition of "control." Indeed, the starting point of the analysis in IBM

As a matter of simple fairness and equal protection (if nothing else), it would seem clear that

the Labor Department should not hold the Former Employees to a higher standard than similarly-

situated worker groups who sought – and were granted – TAA certification during the same general

_____

I was the observation that – although both the Labor Department and the Former Employees appeared to assume that BP must have had "control" over the Former Employees for them to be eligible for TAA certification – the Labor Department's then-existing Leased Worker Policy did not identify "control" as a criterion for leased workers' certification. *See* IBM I, 29 CIT at ____ & n.10, ____ n.18, 403 F. Supp. 2d at 1317 & n.10, 1327 n.18 (*citing* Labor Department Internal Memo re: New Leased Workers Policy, CSAR 261-62).

IBM I also noted that it was not clear "whether – as a matter of practice – the Labor Department ha[d] consistently and uniformly required evidence of 'control'" in cases where it had applied its then-existing Leased Worker Policy. *See* IBM I, 29 CIT at ____ n.18, 403 F. Supp. 2d at 1327 n.18 (*quoting*, *inter alia*, a 2005 Fed. Reg. notice (stating that service workers eligible for TAA certification include "leased workers who perform their duties onsite at the TAA certifiable location on [an] established contractual basis")). IBM I further pointed out that, if indeed "control" was a criterion for leased workers' certification, Pittsburgh Logistics required the Labor Department to "define 'control' more broadly [than simply corporate ownership or affiliation], to include operational reality." IBM I, 29 CIT at ____, 403 F. Supp. 2d at 1327. IBM I therefore directed the Labor Department, on remand, to "explain, *inter alia*, both its policy and its practice concerning 'control' as a criterion for certification of leased workers," and to explain "the precise meaning and significance" of various key terms used in the agency's then-existing Leased Worker Policy. IBM I, 29 CIT at ____ n.18, 403 F. Supp. 2d at 1327 n.18.

Similarly, IBM I noted that "there [was] much room for confusion as to precisely how the agency's classic test for certification as 'service workers' [was] to be interpreted and applied in light of the agency's [then-existing] Leased Workers Policy." IBM I, 29 CIT at ____, 403 F. Supp. 2d at 1346. Accordingly, IBM I instructed that, on remand, the Labor Department was to "spell out with precision all criteria applicable to the Former Employees' potential certification as leased service workers," "explain[ing] the origins of and legal bases for all such criteria." IBM I, 29 CIT at ____, 403 F. Supp. 2d at 1347. The end product was to be "a complete, self-contained statement articulating all agency criteria for TAA certification of leased workers," which was to be "a public document." IBM I, 29 CIT at ____ n.38, 403 F. Supp. 2d at 1336 n.38.

In sum – read properly, in context – the thrust of IBM I was to require the Labor Department to specifically identify, clarify and explain *all* criteria for certification of leased workers under its *existing* policy (as it was then being applied by the agency), to articulate the bases for that policy, to commit that policy to writing, and to publish it (to make it publicly available).

timeframe.[28]  *See* Former Employees of Merrill Corp. v. United States, 31 CIT ____, ____, Slip Op.

_____

[28]The Labor Department also must take care to ensure that it is not – in effect – holding some workers to a *de facto* higher standard than others, by subjecting some workers' claims to significantly greater scrutiny.

For example, the Labor Department seeks to distinguish the facts of the instant case from those in Pittsburgh Logistics, asserting that the Former Employees here "were not part of a subdivision that was 'integrated into the [BP] corporate structure' and did not report 'directly to [BP] employees on all operational matters.' . . . Further, BP personnel did not manage 'all job tasks, direct[] which employees could work at specific locations and specifically relocate[] the [IBM] subdivision along with certain [BP] facilities * * * to [BP's] facilities, evaluate[] [IBM] employee job performance, and advise[] which [IBM] employees should receive merit salary increases.'" *See* Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,714. But that argument is specious. The Labor Department is not quoting from the agency's own *findings* in Pittsburgh Logistics. Rather, the quotes are simply the *claims* of the workers in that case. *See* Pittsburgh Logistics I, 27 CIT at 352 ("The plaintiffs also claim . . . ."). Moreover, the Former Employees in the case at bar make virtually identical claims. There can be little doubt that – if the Labor Department had subjected the claims of the Pittsburgh Logistics workers to the kind of microscopic scrutiny accorded the claims of the Former Employees here – the agency would have found the relationship between the workers and the production firm at issue in Pittsburgh Logistics to be rather more nuanced (less clear-cut) than the agency now seeks to depict it.

Similarly, the Federal Register in which the Notice of Third Negative Redetermination on Remand was published included notices of several TAA investigations in which leased workers were certified – and, presumably, there have been other cases as well. *See*, *e.g.*, Cranford Woodcarving, Inc., Hickory, NC: Amended Certification Regarding Eligibility To Apply for Worker Adjustment Assistance and Alternative Trade Adjustment Assistance, 71 Fed. Reg. 10,709 (March 2, 2006); Lexel Co., Hutsonville, IL: Amended Certification Regarding Eligibility To Apply for Worker Adjustment Assistance and Alternative Trade Adjustment Assistance, 71 Fed. Reg.10,714-15 (March 2, 2006). There is no indication that these and other such cases have been subjected to the degree of agency scrutiny evidenced in the record of this case.

In addition, there is no indication that the Labor Department and its investigators recognize that – as a practical matter, particularly in leased worker cases – the more closely the facts of a particular case are scrutinized, the more ambiguous the case is likely to become (*i.e.*, the more likely it is that the agency will identify facts adverse to the petitioning workers). Whenever a denial of certification is appealed to the court, the facts of that case are (naturally) subjected to greater scrutiny by the agency. If the Labor Department fails to properly "discount" the evidence identified through its enhanced scrutiny in such cases (as compared to the cases where certification was granted) – that is, if the agency implicitly assumes that there were few or no adverse facts in the

07-46 at 27 (Mar. 28, 2007) ("It goes without saying that similarly-situated claimants should be treated similarly under the law.") (citation omitted). Neither the Labor Department nor the Government has addressed this point directly. But, in a different context, the Government has asserted that – compared to other, prior iterations of the agency's Leased Worker Policy – the new Leased Worker Policy is more liberal, because it "*lowers* the burden for establishing eligibility [for TAA certification of leased workers] by eliminating the co-location requirement." *See* Def.'s Brief at 35.

At least in the case at bar, however, there is a powerful argument that, in fact, the Former Employees *were* "co-located" with the production firm at issue, BP. *See generally* section IV.D.3.a, *infra*. If the Former Employees indeed were effectively "co-located" with BP, then they may be

---

cases where it granted certification with relatively little investigation – then the Labor Department is, in effect, unfairly applying a higher standard to leased workers who appeal the denial of their petitions.

The situation is only exacerbated if, when a denial of certification is appealed to the court, the Labor Department (consciously or unconsciously) seeks to elicit evidence to buttress its prior determination, rather than evaluating the case as a neutral, even-handed fact-finder charged with administering a remedial statute, conducting its investigation with the "utmost regard" for the interests of petitioning workers. *See* Pls.' Brief at 1 (charging that agency's remand investigation "was conducted to reach a predetermined negative result"), 5-7 (asserting that "Labor took the position of an advocate seeking to defend its prior decision, rather than the neutral fact-finder it was supposed to be"); Pls.' Reply Brief at 1-3 (arguing that agency's remand investigation was "outcome oriented," "intended to derive information aimed at supporting a predetermined outcome," and "designed to reach a negative determination").

It would be problematic, to say the least, if the Former Employees (or any other group of petitioning workers) were to show that the level of agency scrutiny varies greatly from one leased workers case to another, and that the difference in the level of scrutiny is a major factor in determining whether or not a particular group of workers is certified. The watchword is consistency.

eligible for certification "under the former leased worker policy, which looked only at whether there was a contract and whether the workers were on-site." *See* Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,714 (seeking to distinguish the case at bar from "the situation of the petitioners in Former Employees of Wackenhut Corp. v. USDOL, Ct. No. 02-00758" on the grounds that Wackenhut "was decided under the former leased worker policy, which looked only at whether there was a contract and whether the workers were on-site").

Accordingly, this matter must be remanded to permit the Labor Department to determine – following consultation with the Former Employees – whether the Former Employees' TAA claim should be "decided under the former leased worker policy, which looked only at whether there was a contract and whether the workers were on-site" (or, for that matter, some other prior formulation of the policy), or whether their claim is properly subject to the agency's latest Leased Worker Policy (or some variation of it). *See* Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,714. The Labor Department shall set forth its rationale in the remand results, detailing all relevant legal and policy considerations, as well as the relevant facts.

### B.  The Validity of the Agency's New Leased Worker Policy

Even if the Former Employees' TAA claim is not subject to "the former leased worker policy, which looked only at whether there was a contract and whether the workers were on-site" (*see* Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,714), or some other prior version of  the policy, it does not necessarily follow that their claim is subject to the Labor Department's new Leased Worker Policy.  The validity of that new policy has yet to be established.

As the Former Employees note, the Labor Department failed to provide the requisite

reasoned analysis explaining and justifying its new policy. *See* Pls.' Brief at 18-19. It is black letter

law that, although an agency is permitted to change its methodology in appropriate circumstances,

the agency must nevertheless articulate a reasoned basis for the change. *See*, *e.g.*, British Steel PLC

v. United States, 127 F.3d 1471, 1475 (Fed. Cir. 1997).[29]   Moreover – quite apart from that

generally-applicable tenet of administrative law – IBM I specifically directed that, on remand, the

Labor Department was not only to "spell out with precision all criteria applicable to the Former

Employees' potential certification as leased service workers," but also to "*explain the origins of and*

*legal bases for* all such criteria." IBM I, 29 CIT at ____, 403 F. Supp. 2d at 1347; *see also* 29 CIT

at ____n.38, 403 F. Supp. 2d at 1336 n.38 (emphasis added).

Contrary to the instructions in IBM I (quoted above), the new Leased Worker Policy

embodied in the Third Negative Redetermination on Remand is limited to the issue of control.[30]

And, even as to control, the Labor Department's terse explanation leaves much to be desired. For

example, the Labor Department stated that – in formulating its new seven-criteria test for "control"

– it referred "to pertinent case law; to the Internal Revenue Code (26 U.S.C. §  3121(d)); to

Revenue Ruling 87-41 and to the Restatement (Second) of Agency § 2, *Master*; *Servant*;

*Independent Contractor* and § 220, *Definition of Servant* (1958)."   *See* Third Negative

---

[29]*See also* Atchison, Topeka & Santa Fe Ry. v. Wichita Bd. of Trade, 412 U.S. 800, 808 (1973) (agency changes in policy "must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate"), 817 (agency "must make [its] reasons known to a reviewing court with sufficient clarity to permit it to do its job").

[30]Because the new policy deals only with the issue of control (and does not speak to any other requirements for TAA certification of leased workers), it is a misnomer to refer to the policy as the "Leased Worker Policy." However, that is the terminology used by the Labor Department, and so – to avoid confusion – it is used here as well.

Redetermination on Remand, 71 Fed. Reg. at 10,712.  The Labor Department represented that it

found "the case law related to the 'economic realities' test particularly useful." *Id*.  However, the

agency specifically cited only a single case – Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318,

323-24 (1992) – and failed to identify any other "pertinent case law" that it consulted.

Similarly, the Labor Department did not explain why it chose to rely on certain legal

authorities and not others, much less why it adopted only some of the criteria set forth in the

authorities on which it chose to rely and rejected other criteria set forth in those same authorities.[31]

Thus, for instance, the Labor Department proffered no explanation for its decision not to include

among its seven criteria "the duration of the relationship between the parties" – one of the criteria

listed in the excerpt from Nationwide that the agency quoted in outlining its new policy (and one

that would appear to weigh heavily in favor of the Former Employees).  *See* Third Negative

---

[31]According to the Government, the Restatement (Second) § 220 alone lists more than 10 criteria, and the IRS Revenue Ruling "includes a list of 20 factors."  *See* Def.'s Brief at 33-34.  The Government further asserts that the seven criteria set forth in the Labor Department's new policy "correspond to the factors used by the IRS as a guide and approved by the Supreme Court," and explains:

> Labor's first criteria corresponds to Factor 9 of the Revenue Ruling and Factor (e) of the Restatement.  Labor's second criteria corresponds to Factor (h) of the Restatement.  Labor's third criterion corresponds to Factors 19 and 20 of the Revenue Ruling.  Labor's fourth criterion corresponds to Factor 1 of the Revenue Ruling and Factor (h) of the Restatement.  Labor's fifth criterion corresponds to Factors 17 and 18 of the Revenue Ruling.  Labor's sixth criterion corresponds to Factors 12 and 13 of the Revenue Ruling.  Lastly, Labor's seventh criterion corresponds to Factor 2 of the Revenue Ruling

Def.'s Brief at 35.  The Government's amplification of the Labor Department's new policy is arguably *post hoc* rationalization, however; and – more importantly – it simply underscores the fact that, for reasons that remain unexplained, the new Leased Worker Policy does not incorporate numerous criteria from the sources on which the agency says it relied.

Redetermination on Remand, 71 Fed. Reg. at 10,712.[32]

The Labor Department's statement of rationale is lacking in numerous other respects as well. For example, in citing Nationwide, the Labor Department noted that it was "a case arising under the Employee Retirement Income Security Act," intimating that the agency may have been cognizant that the differing public policies underlying different, but related, areas of the law may influence the substance of the law. *See* Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,712. But the agency's sparse rationale includes no discussion whatsoever of the subject. Certainly there is no indication that, in distilling principles from disparate bodies of law into its seven criteria, the Labor Department was mindful of the remedial nature of the TAA laws and its own obligation to act with the "utmost regard" for the interests of the nation's displaced workers.[33]

Moreover, ignoring the explicit instructions in IBM I, the Labor Department's new criteria fail to provide for consideration of whether the leased workers in a particular case were previously employed directly by the production firm at issue (as they were in the case at bar). IBM I unequivocally directed that:

[I]n both its articulation and its application of its policy vis-a-vis TAA certification

---

[32]Contrary to the Government's assertion, the Former Employees emphatically do not "agree that . . . Labor's [seven newly-articulated] criteria for determining control are satisfactory." *Compare* Def.'s Brief at 32 *with* Pls.' Reply Brief at 5 n.4. Notwithstanding their dissatisfaction with the seven criteria, however, the Former Employees maintain that they can demonstrate that they meet them. *Id.*

[33]The Third Negative Redetermination on Remand does pay lipservice to "the remedial purposes of the Trade Act." *See* Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,712. But the sole reference to the remedial nature of TAA is in the context of explaining the Labor Department's "review[] [of] all record evidence" in reaching its determination in the Former Employees' case. *Id.* The reference has nothing at all to do with the agency's formulation of its new Leased Worker Policy. And, in any event, it is but a passing reference.

of leased workers, the Labor Department should recognize and reflect (for purposes of its analysis of "control") the difference between standard, run-of-the-mill leased workers cases (where there was no pre-existing relationship between the leased workers and the company producing the trade-impacted article) *versus* cases – like this one – where the petitioning workers were "outsourced" by their initial employer [the production firm] and then immediately leased directly back to that company, as part of an outsourcing strategy.

IBM I, 29 CIT at _____ n.38, 403 F. Supp. 2d at 1336 n.38; *see also* 29 CIT at _____ n.20, 403 F.

Supp. 2d at 1328 n.20.[34]  The Labor Department's rationale is inexplicably silent on the subject.[35]

---

[34]*See also* Pittsburgh Logistics I, 27 CIT at 355 (noting that the fact that a particular group of leased workers had been "outsourced" by the production firm which now leased them "would strengthen the[ir] argument for eligibility" for TAA certification).

This highlights the problem at the heart of this case – the Labor Department's continuing failure to come to grips with the relatively unusual facts of this case.

In the typical outsourcing, a company outsources a particular function to a services firm at some other location.  The outsourcing company's existing in-house staff who formerly handled the function are terminated, and are not necessarily hired by the services firm that assumes responsibility for the outsourced work.

In this case, *to ensure continuity*, BP not only outsourced a function, it also outsourced the Former Employees and other BP staffers who had been handling that function in-house for years (and, in some cases, for decades).  Moreover, the outsourcing did not even result in a change of workplace for the Former Employees and the other outsourced workers.  They did not  move into PwC/IBM offices at some other location.  Instead, for the convenience of BP, the Former Employees remained where they had always been located – near the BP Treasury, at the same desks, in the same building, doing the same work for BP that they had been doing for years.  What BP wanted in the PwC/IBM outsourcing – and what BP got – was access to the same workers (the Former Employees and other outsourced BP staffers) without carrying them on the BP payroll.

In the course of the investigation, the Labor Department inquired as to the extent to which it is possible "for an[] employer to outsource employees and continue to receive the workers' services without being considered the outsourced workers' employer."  *See* CSAR 919.  As a threshold matter, the agency's question implicitly assumes an "either/or" situation – that is, that the workers either become "employees" of the services firm to which they are outsourced, or the workers effectively remain "employees" of their former employer.  But that is a false choice.  As the Labor Department has previously acknowledged, the concept of "joint employment" is

The new Leased Worker Policy also suffers from a lack of clarity. For example, the policy includes numerous references to "operational control" as the key concept. *See* Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,711-13. And, in at least one place, the language of the policy suggests that *shared* control of leased workers is sufficient to justify certification. *See* Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,711 (referring to a situation where "a 'client' shares or has exclusive *operational* control over workers"). The policy also refers (with

recognized in numerous areas of the law.

Further, there seems to be a value judgment inherent in the Labor Department's question. In other words, the question seems to assume that it *must* be possible for an employer to outsource its employees and yet continue to use their services but – at the same time – be deemed to have relinquished all "control" over them (so that they could never be eligible for certification as "leased workers"). But the basis for the Labor Department's inherent value judgment is unstated, and unclear. There appears to be no obvious reason why it would do violence to the TAA program to extend benefits to a group of workers who were outsourced by a production firm, but who continued to work exclusively for the former employer and whose livelihoods were tied to the health of the production firm.

In any event, the direct answer to the Labor Department's question is this: Not only are all outsourcing cases not the same (*i.e.*, most involve the outsourcing of only a function, not personnel as well), but it is also true that distinctions can be drawn even among the less common cases of outsourcing, where companies outsource both a function *and* the personnel who used to handle that function in-house. The Former Employees' case is at one extreme, and can be readily distinguished from other similar cases where (for example) the outsourcing results in a change of workplace location for the outsourced personnel, where the outsourcing results in fundamental changes in the nature of the workers' duties or their interactions with their former employer, or where – as a result of the outsourcing – the workers regularly handle work for a number of clients in addition to their former employer (so that their former employer becomes "just another client").

[35]Similarly, in its new Leased Worker Policy, the Labor Department states that – while it "has determined that the existence of a contract between the employer (such as a staffing agency, leasing agency or contractor) of a worker group and a producing firm is not an essential prerequisite" for certification – the presence or absence of such a contract would be an "important" element in its analysis. It is thus somewhat puzzling that the existence (or non-existence) of a contract is not included among the agency's criteria. Again, the Labor Department's rationale sheds no light on the matter.

seeming approval) to "joint employment," "joint employees," and "joint employees of both firms"
– though the policy fails to define or otherwise explain those terms (for example, to explain how
they relate to "shared control").[36] *See* Third Negative Redetermination on Remand, 71 Fed. Reg.
at 10,712.

Elsewhere, however, the language of the policy seems to indicate that leased workers may
be certified only where the production firm has *exclusive* control. *See*, *e.g.*, Third Negative
Redetermination on Remand, 71 Fed. Reg. at 10,711 ("DOL has made every effort to explore
whether the plaintiffs were under the operational control of BP"), 10,712 ("For the former IBM
employees to be found eligible, the Department must be able to establish that 'client' BP, not

---

[36]As IBM I explained, the Labor Department's then-existing Leased Worker Policy provided
that "the existence of a standard contract between the contractor firm [*i.e.*, the leased workers'
employer] and the subject firm [*i.e.*, the company producing the trade-impacted article] . . . should
be considered sufficient evidence to prove *the existence of a joint employer relationship*." IBM I,
29 CIT at ____, 403 F. Supp. 2d at 1317 (*quoting* Labor Department Internal Memo re: New Leased
Workers Policy, CSAR 261-62) (emphasis added). IBM I further noted:

> Other than the [quoted] statement . . ., the Labor Department memorandum says little
> about *the concept of a* "*joint employer*" *relationship*, except to incorporate by
> reference another memorandum – missing from the record . . . – which apparently
> discusses that concept at greater length. *See* Labor Department Internal Memo re:
> New Leased Workers Policy (CSAR 261-62) (referring to a "memorandum, dated
> November 21, 2003, requesting [a] decision on the issue of leased production vs.
> service workers" that apparently outlines options including *a* "'*joint employer*'
> *option* (Option 1)," which the new Leased Workers Policy purports to adopt with
> certain "important differences").

IBM I, 29 CIT at ____, 403 F. Supp. 2d at 1318 (emphases added).

The Labor Department was expressly instructed, on remand, to "clarify not only its position
on 'control,' but also on '*joint employer*' *relationship*s." IBM I, 29 CIT at ____ n.38, 403 F. Supp.
2d at 1336 n.38 (emphasis added).

'employer' IBM, exercised effective operational control over the workers' performance of their duties. In essence, DOL must determine whether the outsourcing of BP workers effectively transferred control over those workers to PwC/IBM."). These and other instances of the confusing use of critical terminology render the Labor Department's new policy substantially flawed.[37]

On remand, the Labor Department shall clarify and expand its new Leased Worker Policy, to address – at a minimum – the points outlined above, in addition to other points raised in IBM I which the policy does not presently address.[38] Finally, the revised policy shall be a public, "stand-alone" document (separate and apart from the agency's redetermination on remand analyzing the facts of the case at bar, but filed with it).

### C. The Timing of the Agency's Issuance of Its New Leased Worker Policy

The Former Employees characterize the Labor Department's standard for TAA certification in this case as "a constantly moving target." Pls.' Brief at 15. As they see it, "[a]s soon as the Former Employees submit evidence establishing their eligibility for certification pursuant to Labor's

---

[37]IBM I previously criticized the Labor Department and the Government for similar inconsistencies in their statements of the applicable standard. *See generally* IBM I, 29 CIT at ____ n.19, 403 F. Supp. 2d at 1327 n.19 (noting that the Government's brief "variously restates the test for certification as whether IBM 'abdicated' control over the Former Employees or whether "IBM's role was relegated to mere 'nominal staffing,'" and contrasting such language with the Labor Department's then-existing Leased Worker Policy, which "expressly endorse[d] certification of leased workers where there [was] a 'joint employer' relationship") (citations omitted).

[38]The new revised policy shall also expressly address the extent to which that policy applies to leased *production* workers, as well as leased *service* workers. *Cf.* IBM I, 29 CIT at ____ & n.43, 403 F. Supp. 2d at 1339-40 & n.43 (discussing leased service workers vs. leased production workers, including citations to the Government's prior brief, which addressed the subject). *See also* Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,711 ("Thus, the client's exercise of *some* control does not establish that a 'client' shares or has exclusive *operational* control over workers employed by an unaffiliated *service* provider . . .") (third emphasis added).

last articulated standard, Labor determines that the Former Employees are not eligible for certification based upon an entirely different certification standard." *Id*.; *see also* Pls.' Reply Brief at 2 (asserting that "Labor's 'moving target' approach is fundamentally unfair to the Former Employees and is inconsistent with Labor's mandate to conduct TAA investigations with the 'utmost regard' for the petitioning workers"). The Former Employees maintain that the most recent remand proceeding was no different.

The Former Employees assert that – notwithstanding their repeated requests during the course of the remand proceeding – the Labor Department "refused to explain the control standards upon which its decision would be based." Pls.' Reply Brief at 2, 4 & nn.1-2; *see also* Pls.' Brief at 10, 17. They point out that "[o]nly after Labor's [most recent] negative remand determination was filed with the Court did the Former Employees learn the test that determined their fate." Pls.' Reply Brief at 5. According to the Former Employees, "[b]ecause Labor did not notify the Former Employees of the existence of [its new] seven factor test until Labor issued its [most recent] decision denying the Former Employees' request for certification, it was impossible for the Former Employees to bring to Labor's attention pertinent information addressing each of the seven factors of the test." Pls.' Reply Brief at 6. Instead, the Former Employees "were left to submit information and analysis on control based on what became a superseded standard." Pls.' Brief at 17 (citation omitted). *See also* Pls.' Brief at 15-16 & n.7; Pls.' Reply Brief at 2, 4.[39]

---

[39]The Former Employees express fear that, on remand, the Labor Department will "once again change the rules for certification, continuing to make it impossible for the Former Employees to demonstrate their eligibility for certification." *See* Pls.' Brief at 17. The Former Employees point with particular concern to the Third Negative Redetermination on Remand, where the Labor Department states that it expressly "retains the discretion to further revise [its Leased Service

The Government emphasizes, in turn, that the Labor Department's new Leased Worker

Policy "evolved as the [remand] investigation proceeded," and that "the policy was not finalized

until the investigation was completed and the determination was being written." Def.'s Brief at 36;

*see also id.* at 25 (the new policy "evolved as the investigation proceeded"). But that is no answer

to the Former Employees' complaint. Even assuming that the Labor Department did the best that

it could under the circumstances,[40] the Former Employees nevertheless had a right to know – in

_____

Worker Policy], so that the subject of 'operational control' can continue to receive close scrutiny as DOL undertakes rulemaking to update the [relevant] regulations." *See* Pls.' Brief at 17-18 (*quoting* Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,712).

However, as section IV.A above notes, it is not clear that the Former Employees are necessarily subject to certification standards that were not in place at the time of their termination. Moreover, any risk associated with potential future rulemaking is limited. "Retroactivity is not favored in the law." Bowen v. Georgetown University Hospital, 488 U.S. 204, 208 (1988). Thus, as a general principle, regulations – like statutes – are not construed to have retroactive effect.

Anticipating the tandem problems of a standard that is a "moving target" and the resulting need for repeated remands, IBM I instructed the Labor Department both to *identify* all applicable criteria for certification (not just the criteria for control), and to *make determinations on* all such criteria. *See* IBM I, 29 CIT at ____, 403 F. Supp. 2d at 1347 (directing agency to "spell out with precision all criteria applicable to the Former Employees' potential certification" and to "make determinations as to whether each of the criteria is certified in this case"); *see also* BMC, 30 CIT at ____ & n.65, 454 F. Supp. 2d at 1339-52 & n.65 (highlighting problem of "'ping-pong' phenomenon, where a case repeatedly bounces back and forth between the Labor Department and the court as a result of the agency's standard 'piecemeal' approach to the investigation of TAA petitions").

Unfortunately, as discussed elsewhere in greater detail, the Labor Department's Third Negative Redetermination on Remand failed to comply with either of those two Court directives.

[40]Besides arguing that the newly-articulated criteria for control were not finalized until the Third Negative Redetermination on Remand issued, the Government also contends that the Former Employees "cannot reasonably claim to have been blindsided," because the criteria "merely formalized the factual inquiry that Labor had conducted" in the course of the remand proceeding. *See* Def.'s Brief at 35-36. However, as the Former Employees note, particularly under the circumstances presented here, it is far too much to expect that they "should have divined Labor's

advance – the standard by which their claim would be judged, so that they might proffer relevant evidence before the agency rendered its decision.

On remand, the Labor Department shall ensure that the Former Employees have proper advance notice of the specific criteria to be applied to their claim, and that they have adequate opportunity to marshal relevant evidence and frame arguments tailored to those criteria for the consideration of the agency.

### D.  The Agency's Analysis of "Operational Control" in This Case

In its Third Negative Redetermination on Remand, the Labor Department first set forth its new seven-criteria test for operational control, and then applied those seven criteria to the facts of this case.  The Labor Department concluded that each of the seven criteria weighed against the Former Employees, and reaffirmed its denial of certification.  *See* Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,712 (listing seven criteria), 10,712-14 (agency's application of criteria to facts of this case); *see also* CSAR 1035-50 (unredacted version of agency's application of criteria to facts of this case).  In contrast, the Former Employees maintain that, although they were deprived of proper advance notice of the Labor Department's newly-articulated criteria, the record evidence as a whole nevertheless demonstrates that the agency's latest seven-part test for control

test from questions that it was asking of BP and IBM."  *See* Pls.' Reply Brief at 3-4.

Moreover, the Government can't have it both ways.  The Government cannot fairly argue that the Former Employees were effectively on notice of the seven criteria, and also argue that it was not possible to give the Former Employees notice of the criteria because they were not finalized "until the investigation was completed and the determination was being written."  *See* Def.'s Brief at 36.

is satisfied in this case. *See* Pls.' Brief at 16 n.7, 19-31; Pls.' Reply Brief at 5 n.4.[41]

As discussed in greater detail below, the Labor Department's compilation and analysis of the record on remand was plagued with a number of overarching methodological problems which must be remedied by the agency, and which largely obviate the need to conduct a criterion-by-criterion review of the agency's determination at this time.[42]

### 1. The Transparency and Fairness of the Remand Proceeding

The Former Employees argue that the remand investigation was lacking in transparency, and that it was designed "to reach a predetermined negative result." Pls.' Brief at 1, 5-7, 8-11; Pls.' Reply Brief at 1-3.

Indeed, as outlined above, it is fair to say that the Labor Department never truly embraced IBM I's encouragement to "engage in full and candid consultations with the Former Employees on all issues" on remand. *See* section II.B.6, *supra*; IBM I, 29 CIT at ____, 403 F. Supp. 2d at 1347.

---

[41]The Former Employees assert that – although the Labor Department describes its new seven-criteria test for control as a "balancing test" and states that none of the seven criteria is "dispositive" – all criteria are satisfied in this case. See Pls.' Brief at 19; Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,712.

[42]Other considerations also counsel against a criterion-by-criterion "substantial evidence" review of the Labor Department's determination at the present time. For example, it is possible that, in consultation with the Former Employees, the agency will conclude on remand that the Former Employees' claim should be subject to some prior iteration of the agency's Leased Worker Policy. *See* section IV.A, *supra*. It is also possible that, on reflection, the agency may modify its standard for control. *See* section IV.B, *supra*. Similarly, even if the Former Employees' claim is not subject to some prior version of the Labor Department's Leased Worker Policy, and even if the agency does not modify its standard for control, the agency must evaluate and reflect in its determination any additional evidence that the Former Employees may seek to adduce based on proper notice of the criteria by which their claim will be judged.

A number of the Former Employees' specific complaints are addressed elsewhere herein.[43] But the

Former Employees' most serious charge is that the Labor Department has prejudged their case.

Specifically, the Former Employees assert that, on remand, the agency failed to "act[ ] as a

neutral fact-finder, gathering facts for a later, reasoned analysis," and – instead – "took the position

of an advocate seeking to defend its prior decision." *See* Pls.' Brief at 6. The Former Employees

contend that the agency's actions were "outcome oriented, with a policy [on operational control]

being crafted around record evidence rather than record evidence being evaluated against an existing

policy." Pls.' Reply Brief at 1.

Pointing to the Labor Department's representation that its new policy on control "was not

finalized until the investigation was completed and the determination was being written" (*see* Def.'s

Brief at 36), the Former Employees assert that the agency thus "admits that only after it gather

evidence and finalized the record did it develop a policy." Pls.' Reply Brief at 2-3. According to

the Former Employees:

> Labor "put the cart before the horse," framing its policy around the existing
> evidence. Indeed, Labor should have articulated its policy [and only] then, in
> consultation with all interested parties, investigated whether the facts of this case fit
> into that framework.

*Id*. at 3. The Former Employees conclude that "[t]he only explanation for Labor's investigative

methodology on remand is that it was designed to reach a negative determination." *Id*.

---

[43]*See*, *e.g.*, section IV.B, *supra* (addressing the Former Employees' argument that the Labor Department failed to adequately explain and justify its new policy); section IV.C, *supra* (addressing the Former Employees' criticism of the timing of the agency's issuance of its new policy); section IV.D.2.a(3), *infra* (addressing the Former Employees' exclusion from agency teleconferences, as well as their concerns about the accuracy of agency memoranda documenting those teleconferences).

The sequence of events on remand – with the Labor Department formulating its policy in parallel with its investigation of the facts of this case – is unfortunate, and did nothing to dispel whatever concerns the Former Employees might otherwise have harbored about the agency's ability to reconsider its prior determinations fairly and impartially. As the Government emphasizes, however, agencies are generally entitled to the benefit of a presumption of regularity, which is rebutted only by proof that the decision maker is "not 'capable of judging a particular controversy fairly on the basis of its own circumstances.'" *See generally* Def.'s Brief at 20-21 (*quoting* Hortonville Joint Sch. Dist. v. Hortonville Educ. Ass'n, 426 U.S. 482, 493 (1976) (citation omitted)); *see also* NEC Corp. v. United States, 151 F.3d 1361, 1373 (Fed. Cir. 1998) (standard is met "when the challenger demonstrates, for example, that the decision maker's mind is 'irrevocably closed' on a disputed issue") (citation omitted).

The fact that the Labor Department's new Leased Worker Policy was developed in parallel with the agency's investigation of the facts of this case does not alone suffice as the type of nearly "irrefragable" proof required to rebut the presumption of regularity. *See* Sanders v. U.S. Postal Serv., 801 F.2d 1328, 1331 (Fed. Cir. 1986). But there are other factors that call the agency's impartiality into question even more directly.

For example, a comprehensive review of the administrative record reveals that, in its Third Negative Redetermination on Remand, the Labor Department uniformly credited the information supplied by corporate sources over that provided by the Former Employees, and that – in those instances where corporate sources provided conflicting information – the agency virtually always accepted the version most adverse to certification of the Former Employees. These facts, which are

unexplained by the agency, legitimately raise the spectre of bias and cast a long shadow over the agency's findings and determinations, particularly in light of the *ex parte* nature of TAA investigations and the Labor Department's obligation to act with the "utmost regard" for the interests of petitioning workers.[44]

### 2.  The Agency's Compilation and Analysis of the Record

The Labor Department's Third Negative Redetermination on Remand reflects a number of methodological problems in the agency's compilation and analysis of the record on remand.  As explained below, the most significant problems concern the agency's failure to take necessary measures to ensure the reliability of the evidence on which it relied, and the agency's failure to properly take into account countervailing evidence.

### a.  The Reliability of Evidence

In compiling the record on remand, the Labor Department failed to take adequate measures to ensure the reliability of the evidence on which it based its determination, in contravention of express instructions in IBM I, other relevant precedent, and sound administrative practice.

---

[44]This is not the first time that the Labor Department has found itself on the receiving end of such criticism. *See*, *e.g.*, Pittsburgh Logistics I, 27 CIT at 349 n.13 (where the court refers to the agency's "foregoing (or foregone) conclusion"); Pittsburgh Logistics II, 27 CIT at 1310, 1313 (where the court found that the agency's consideration of TAA petition was "results-oriented" and that agency's reasoning made its negative determination "appear predetermined"); Former Employees of Murray Engineering, Inc. v. Chao, 28 CIT ____, ____n.7, 358 F. Supp. 2d 1269, 1273 n.7 (2004) (where court found it "simply disingenuous for the agency, upon learning that the HTSUS does not provide the result the agency appears to have already chosen, to now argue that it is inappropriate to refer to the HTSUS"); United Elec., Radio & Mach. Workers, 15 CIT at 309 (where court found that agency used "protean reasoning to force its negative determination to fit whatever new claims come to light").

(1)  The Notices to BP and IBM Officials Mandated by IBM I

In light of concerns about the reliability of information provided by corporate executives (in this case, as well as other TAA cases),[45] IBM I instructed the Labor Department to take measures to help ensure the accuracy of evidence obtained on remand:

> To help ensure the completeness and accuracy of information obtained on remand, the Labor Department shall expressly advise and assure all its contacts at IBM and BP that – unlike regular unemployment compensation, for example – the TAA certification of the Former Employees would involve no expense whatsoever on the part of the companies.
>
> To the same end, the Labor Department shall caution all contacts that they will be held personally accountable by the Court for all information that they provide in the course of the agency's investigation, whether their statements are oral or in writing, and even if they are not made under oath.  *See*, *e.g.*, 18 U.S.C. § 1001 (federal material false statements statute).

IBM I, 29 CIT at _____ n.37, 403 F. Supp. 2d at 1336 n.37.  *See generally* BMC, 30 CIT at _____ n.51, 454 F. Supp. 2d at 1331-36 n.51 (noting, *inter alia*, that Labor Department has elsewhere warned corporate executives, in writing, that they "will be responsible for the accuracy and completeness of the information" supplied in TAA investigation; and also noting that U.S. Department of Agriculture, Form FSA-229, "Application for Trade Adjustment Assistance (TAA) for Individual Producers" includes a notice cautioning applicants that "[t]he provisions of criminal and civil fraud

---

[45]*See also* BMC, 30 CIT at _____, 454 F. Supp. 2d at 1328-37 (discussing "The Labor Department's Over-Reliance on Employer-Provided Information"; noting that "just as the Labor Department seems to impute to *petitioning workers* a motivation to stretch the truth in an effort to secure TAA benefits, so too *employers* have certain inherent incentives to be less than candid and fully forthcoming as well"; surveying relevant caselaw; and highlighting some of the various motivations that might influence corporations' responses to TAA investigations).

statutes, including 18 USC 286, 287, 371, 641, 651, 1001; 15 USC 714m; and 31 USC 3729, may be applicable to the information provided").

In their opening brief post-remand, the Former Employees pointed out that – notwithstanding the unequivocal language of IBM I – "[t]he record [on remand] demonstrates no effort by Labor to clarify [to representatives of BP and IBM] that TAA certification would not involve any expense to the companies." *See* Pls.' Brief at 7. In response, the Government filed a declaration by the agency investigator who was responsible for the remand investigation. Citing that declaration, the Government argues that, "[i]n Labor's discussions with the companies, it was apparent that they understood the effect of certification," and that "the senior attorney for BP confirmed that BP had been informed . . . that the companies would not incur any expense in the event of certification." *See* Def.'s Brief at 22 (*citing* declaration of agency investigator).[46]

The declaration of the Labor Department investigator is not part of the administrative record, however. Thus, the fact remains that there is *no evidence on the record* that the agency complied with IBM I's mandate requiring the agency to "expressly advise and assure all its contacts at IBM and BP that . . . the TAA certification of the Former Employees would involve no expense whatsoever on the part of the companies." Moreover, it is no answer that the agency investigator "inferred from [her] conversation that IBM was already fully aware that any benefits provided . . . would be covered by Department, not IBM, funds." Declaration ¶ 2 (*cited in* Def.'s Brief at 22).

---

[46]Contrary to the Government's brief, there is nothing to indicate that "*BP* had been informed by . . . plaintiffs' counsel that the companies would not incur any expense in the event of certification." *See* Def.'s Brief at 22 (emphasis added). Instead, the agency investigator's declaration states that "petitioners' counsel brought the cost issue to [the] attention [*of the agency's primary contact at IBM*] during one of their conversations." Declaration ¶ 14.

It is not for the agency to decide that compliance with certain judicial directives is unnecessary under the circumstances.

More substantively, the agency investigator's declaration establishes that, in the course of the remand proceeding, the agency gave the notice at issue – at most – to a BP attorney and to an IBM attorney.[47] *See* Declaration ¶¶ 2, 14. The agency investigator's sole conversation on this issue with the agency's primary IBM contact did not take place until the Government was preparing its post-remand brief (*see* Declaration ¶ 14) – well after the agency had obtained all evidence from IBM, well after the remand proceeding had been concluded, and well after the Third Negative Redetermination on Remand had been filed with the Court. To serve the purpose of ensuring the reliability of information provided by corporate representatives, the notice mandated by IBM I had to be given to them before the agency requested evidence. *Post hoc* notice is simply ineffective.

Further, IBM I required the Labor Department to give the mandated notice to "*all* [*the agency's*] *contacts* at IBM and BP" – not just to its initial contacts. IBM I, 29 CIT at ____ n.37, 403 F. Supp. 2d at 1336 n.37 (emphasis added). Thus, to the extent that the Labor Department had contact with company representatives other than the lawyers who were its initial contacts at IBM

---

[47]The agency investigator's declaration actually gives no indication whether or not she gave the mandated notice to the IBM attorney. In relevant part, she states only that:

> I informed the legal departments of IBM and BP of the upcoming investigation and asked for their cooperation in providing responses to questionnaires and document requests. At BP, I spoke with . . . a BP attorney, describing the TAA program and BP's connection with this case. In particular, as required by the Court's Opinion, I told [the BP attorney] that TAA certification of IBM workers would not cost BP anything. *At IBM, I left a message with Mr.* [*name of lawyer*]*, an attorney for IBM*.

Declaration ¶ 2 (emphasis added).

and BP, the agency did not merely fail to *document* its compliance with IBM I – the agency *substantively* failed to comply with the mandate of the Court. *See*, *e.g.*, SAR 846 (identifying five BP officials who provided information for responses to agency questions); CSAR 758, 761, 977 (listing three IBM officials who participated in teleconference with agency), 787 (noting that information in IBM's responses to agency's third set of questions was "primarily" provided by two IBM officials), 788 (naming two IBM officials who provided information for responses to agency's fifth set of questions), 792 (identifying two IBM officials who provided information for responses to agency questions), 972 (specifying two IBM officials who provided information for responses to agency's fourth set of questions), 993 (listing four BP officials who participated in teleconference with agency).

However ham-handed they may have been, the Labor Department apparently made at least some efforts to comply with IBM I's requirement that the agency assure contacts at IBM and BP that TAA certification of the Former Employees would involve no expense on the part of the companies. In contrast, there is no indication whatsoever that the agency complied with IBM I's requirement that the agency "caution all [IBM and BP] contacts that they will be held personally accountable by the Court for all information that they provide in the course of the agency's investigation." *See* IBM I, 29 CIT at ____ n.37, 403 F. Supp. 2d at 1336 n.37.

On remand, the Labor Department shall expressly advise and assure all of its contacts at IBM and BP, in advance, that – unlike regular unemployment compensation, for example – the TAA certification of the Former Employees would involve no expense whatsoever on the part of the companies. Further, to the extent that the agency's contacts at IBM and BP solicit information from

other individuals within the companies in order to respond to the agency's inquiries, the agency shall ensure that all other such individuals receive the same advance notice and assurances.

To the same end, on remand, the Labor Department shall caution all of its contacts at IBM and BP, in advance, that they will be held personally accountable by the Court for all information that they provide in the course of the agency's investigation, whether their statements are oral or in writing, and even if they are not made under oath. Further, to the extent that the agency's contacts at IBM and BP solicit information from other individuals within the companies in order to respond to the agency's inquiries, the agency shall ensure that all other such individuals receive the same advance warning.

The Labor Department's compliance with these requirements shall be fully documented in the record of the remand proceeding.

(2)  The Agency's Assessment of the Reliability of Evidence

In this case – as in many others – the Labor Department has displayed what is either an unwillingness or an inability to critically evaluate the reliability of evidence compiled in the course of its TAA investigations. *See generally* n.45, *supra*.

Time and time again, the Third Negative Redetermination on Remand expressly cites to and relies on information that is, on its face, suspect. For example, in reaching a determination in this case on the first of the seven new criteria for control, the key piece of evidence cited by the Labor Department is that – when asked whether IBM employees worked alongside BP personnel in Tulsa – an official of one of the companies responded: "There *may have been* times when a BP employee came to IBM's office in Tulsa . . ." *See* CSAR 1037 (citations omitted) (emphasis added).

However, speculation is not reliable evidence.  Moreover, the reason for the speculative nature of the corporate official's statement is unclear.  Either the official was – for some unknown reason – playing coy, and deliberately seeking to downplay or minimize the facts of the situation (suggesting, for example, the possibility of bias), or the official lacked personal, first-hand knowledge of the relevant facts.  But, either way, the statement is inherently unreliable.[48]

Similarly, in reaching its determination on another criterion, the Labor Department relied on a corporate official's statement that "BP employees in Tulsa did not share office space with IBM, though BP *may have had* office space on other floors in the same Tulsa office building."  *See* CSAR 1046 (citation omitted) (emphasis added).  In fact, the record is clear that BP and IBM were located in the same Tulsa office building.  The reason for the speculative nature of the official's representative's statement, on the other hand, is entirely unclear.  Again, either the official was – for some reason – playing coy, and deliberately seeking to obscure the facts of the situation, or the official lacked personal, first-hand knowledge of the relevant facts.  Either way, however, the statement cannot be credited.[49]

_____

[48]*See generally* <u>BMC</u>, 30 CIT at ____, 454 F. Supp. 2d at 1335 n.51 ("The reliability of information depends, in equal measure, both on the knowledge and authority of the source of the information, and on that source's honesty.  If the Labor Department believes that BMC's Senior Manager for Human Resources actually did not know that her statements were false, it is entirely unclear (based on its experience in this and many other such cases) why the agency persists in treating employers' human resources executives as *authoritative*, *knowledgeable* sources in TAA investigations.  If – on the other hand – the Labor Department believes that BMC's Senior Manager for Human Resources intentionally prevaricated, it is not only unclear why the agency continues to treat employers' human resources executives as presumptively *honest* sources, but it is also unclear why the agency apparently routinely permits them to lie with impunity.").

[49]In the course of the remand investigation, the Labor Department itself (quite properly) expressed concern about corporate officials' use of hedged, equivocating language in their responses to agency questions, noting that such language raises questions about whether the responses are

The Third Negative Redetermination on Remand – and the administrative record in general – are replete with other comparable circumlocutions, which the Labor Department blindly and uncritically accepted at face value. *See*, *e.g.*, CSAR 1040 (stating that representatives of both IBM and BP acknowledged that "there *may have been* some interaction between IBM and BP employees") (emphasis added); CSAR 791 (source stated that, "during the course of the agreement, BP *might have* provided feedback on [IBM] employees (*e.g.*, BP *might have* requested that an employee [of IBM] be removed from its account if BP was not satisfied with such employee's performance)") (emphases added); CSAR 736 (source stated that "*it is possible* that the IBM workers assigned to perform services for BP would have been assigned to perform services for other clients") (emphasis added).

Statements such as those listed above should cause the Labor Department not only to discount the specific statements at issue, but also – more generally – to question the fundamental veracity of the quoted sources and the reliability of all information provided by them. Particularly given the remedial nature of the TAA statute, the *ex parte* nature of the Labor Department's investigative process, and the agency's obligation to act with the "utmost regard" for the interests of petitioning workers, the agency seems remarkably unconcerned as to whether or not the sources on which it relies are in a position to have personal, firsthand knowledge of the relevant facts,[50] and

---

"reasonably complete." *See*, *e.g.*, CSAR 779 (agency noted that "[w]ords like 'primarily' and 'typically' [in company's responses] suggest that there are other duties that have not been included in the [company's] response. Please consider those (and any similar) responses and revise them as necessary to include reasonably complete information."). As discussed above, the agency nevertheless expressly relied on questionable responses in reaching its determination.

[50]In the Third Negative Redetermination on Remand, the Labor Department stated: "As documented in the [Supplemental Administrative Record], DOL obtained cooperation from multiple

whether or not they have some bias that might undermine any evidence they provide.[51]

The Government emphasizes that the Court of Appeals has held that the Labor Department

"is entitled to base an adjustment assistance eligibility determination on statements from company

---

IBM and BP officials, whose responsibilities and access to pertinent information made them sufficiently informed to be proper sources for the investigation. SAR 742, 761-764, 846." *See* Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,711.

It is noteworthy, however, that the information provided by the corporate contacts on which the Labor Department relied was not submitted under oath. *See generally* BMC, 30 CIT at ____ n.51, 454 F. Supp. 2d at 1334–36 n.51 (discussing range of potential means to help ensure reliability of information provided in TAA investigation) (*citing*, *inter alia*, Barry Callebaut, 357 F.3d at 1383 (sustaining agency's denial of TAA certification, largely on the strength of sworn employer affidavits, which – the Court of Appeals emphasized – were submitted under solemn oath acknowledging liability for perjury; "those affidavits were sufficiently trustworthy to constitute substantial evidence")).

Moreover, contrary to the agency's implication, the agency did not consistently inquire as to the duration of its sources' employment with BP and/or PwC/IBM, or their position titles (much less their actual job responsibilities and the bases for their knowledge of relevant facts, particularly their familiarity with the situation of the Former Employees). Nor, in most instances, is there any indication in the record as to the locations of the agency's corporate sources. The Labor Department's principal contact at IBM appears to be located in New York – halfway across the continent from Tulsa. *See*, *e.g.*, CSAR 733. The locations of most of the agency's other corporate contacts are not clear. *See generally* IBM I, 29 CIT at ____ n.15, 403 F. Supp. 2d at 1322 n.15 (*quoting* Pittsburgh Logistics I, 27 CIT at 348 ("The Court does not presume that the [corporate] Employment Development Specialist . . . located in Rochester [New York] who responded to the [agency] investigator's questions about the petitioners was 'in a position to know' the extent of the petitioners' jobs in Independence [Ohio].")).

[51]The Labor Department deprives itself of a valuable means of testing the credibility and reliability of evidence when it fails to allow petitioning workers to review and comment on information provided by company representatives. *See*, *e.g.*, Pls.' Brief at Exh. 2 (Labor Department fax coversheet warning that "all information and documentation submitted by companies in connection with this investigation is [to be] held in strict confidence and [shall] only be seen by the DOL, the Court and the lawyers involved in this matter"); Pls.' Brief at 26 n.9 (although agency provided counsel for Former Employees with copies of companies' responses to agency questions, agency stated that those responses included confidential information and therefore could not be shared with Former Employees themselves).

officials if the Secretary reasonably concludes that those statements are creditworthy and are not

contradicted by other evidence." *See* Def.'s Brief at 59 (*quoting* Marathon Ashland, 370 F.3d at

1385). But the key word there is "reasonably." In the case at bar, there is no apparent basis on

which certain key evidence can "reasonably" be deemed "creditworthy." *See generally* IBM I, 29

CIT at ____ n.27, 403 F. Supp. 2d at 1332 n.27 (cataloguing caselaw on evaluating the credibility

and reliability of evidence in TAA investigations).[52]

---

[52]IBM I noted that there was evidence in the record to "cast[] some doubt" on IBM's motivation to be fully candid and forthcoming in the TAA investigation, citing both to a statement by one of the representative Former Employees that "IBM is avoiding publicity as this type of situation (moving U.S. jobs overseas) has become a serious political issue," and to a copy of a New York Times article reporting on a conference call in which "two senior I.B.M. officials told their corporate colleagues around the world . . . that I.B.M. needed to accelerate its efforts to move white-collar . . . jobs overseas even though that might create a backlash among politicians and its own employees." *See generally* IBM I, 29 CIT at ____ n.26, 403 F. Supp. 2d at 1322 n.26.

The Government asserts that "suspicion that IBM company officials have an interest in misrepresenting facts merely because of a fear of bad publicity is unwarranted where the shift in production at issue would be at BP." *See* Def.'s Brief at 60. But there are at least two flaws in the Government's argument.

First, as the Third Negative Redetermination on Remand itself notes, the Former Employees have asserted in the past that *IBM* "was transferring the accounting services performed at the [Tulsa] facility to India and that 'Indians had been training at the [Tulsa] center all summer.'" *See* Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,710. And, second, and more importantly, even if the only alleged shift in production was at BP, it would be naive in the extreme to think that IBM would have no interest at all in protecting a major client – BP – from adverse publicity and other potentially negative consequences. *See generally* BMC, 30 CIT at ____, 454 F. Supp. 2d at 1331-37 (noting that Labor Department's views on reliability of company statements in TAA investigations are "simplistic and naive, at best").

The Labor Department's assessments of the credibility and reliability of evidence cannot be deemed "reasonable" and deserving of deference if the agency is as unsophisticated as it sometimes appears to be. In addition to the broad spectrum of corporate motivations and incentives outlined in BMC, *supra*, it is also significant that the Labor Department is a pervasive regulator, with wide-ranging jurisdiction over matters from wages and hours to occupational health and safety. Major

On remand, the Labor Department shall accord no weight to evidence which is based on "speculation" (such as that outlined above), and shall specifically consider whether – in light of the speculation – all other evidence offered by the source is similarly unreliable. In addition, the agency shall specifically evaluate the credibility and reliability of each piece of evidence on which it relies (including realistic assessments of the potential motivations and incentives of all sources), in accordance with the principles outlined above and the authorities cited there. The agency's determination on remand shall be based solely on evidence that is reasonably deemed credible and reliable pursuant to those principles.

(3)  The Accuracy of Agency Memoranda Summarizing Teleconferences

The Former Employees note that the Labor Department's determination relies, in part, on

---

multinational corporations such as IBM and BMC thus have a clear interest in "keeping the Labor Department (and other federal regulators) happy," and at least some incentive to "say whatever it is that the agency wants to hear." (In this case, for example, company representatives might well have logically inferred that their corporate interests would be best served by providing information to support the agency's prior determination denying the Former Employees' petition for TAA certification. Accordingly, "IBM's and BP's consistent cooperation and responsiveness to the Department's inquiries" (*see* Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,711) is not necessarily the hallmark of credibility and reliability that the Labor Department here suggests.)

And corporations may have additional, unique motivations and incentives in "leased workers" cases such as this. They may be legitimately concerned about the collateral consequences – for purposes of taxes, health and retirement benefits, tort liability, and other areas of the law (above and beyond TAA certification) – of full disclosure of the true nature and extent of their "control" over workers who are not "employees" on their payroll. *See*, *e.g.*, CSAR 895-96 (BP-PwC contract provision specifically addressing such concerns). In the course of the remand investigation, in at least one instance, the Labor Department prefaced a question to BP with the comment: "The former IBM employees have characterized themselves as *de facto* employees of BP." *See* CSAR 817. Now *that* is a statement guaranteed to strike fear in the heart of any BP employment or tax lawyer.

memoranda prepared by the Labor Department investigator, which summarize teleconferences between agency personnel and other interested parties, including officials at IBM and BP, as well as counsel for the Former Employees. The Former Employees express concern that, "[u]pon receipt of the record, counsel for the Former Employees discovered inaccuracies in summaries of conversations they had with Labor." *See generally* Pls.' Brief at 11-14. The Former Employees acknowledge that "it is possible for parties to have different recollections of the *minor* details in conversations," but emphasize that "Labor's summaries contain errors involving *significant* details and call into question the reliability of all the summaries prepared by Labor – particularly because counsel for the Former Employees were denied the opportunity to participate in Labor's discussions with representatives from BP and IBM." Pls.' Brief at 13 (emphases added).[53]

---

[53]A review of one such summary makes it apparent to anyone with a solid command of the facts of this case that – at a bare minimum – the Labor Department investigator oversimplified the Former Employees' position in documenting a teleconference for the record. *See* SAR 904. Similarly, the agency elsewhere oversimplified (indeed, arguably misrepresented) the Court's position on the agency's procurement of the contract between BP and PwC/IBM. *See*, *e.g.*, CSAR 742 ("Judge Ridgeway specifically referred to contract, and it is DOL has the agreement on the record."), 744 ("As I indicated, Judge specifically requested the copy of the contract to be included in the files as it is very crucial for our investigation."); *compare* IBM I, 29 CIT at ____ n.36, 403 F. Supp. 2d at 1335 n.36 ("The Labor Department would be wise to obtain a copy of the [contract] between BP and PwC/IBM on remand here. If it fails to do so and nevertheless reaches a determination on 'control' that is adverse to the Former Employees, it must explain why it failed to obtain the document(s) in question . . ."). *See also* Def.'s Brief at Declaration ¶ 12 (attesting that, in teleconference with agency, counsel for Former Employees offered "to write the new policy [on control], because international trade regulation is his field of expertise"); *compare* Pls.' Reply Brief at Taylor Declaration ¶ 11 & Shaughnessy Declaration ¶ 5 (indicating that, in teleconference with agency, counsel for Former Employees never made such an offer, but did inquire whether Labor Department intended to issue draft determination for comment before issuing its final determination, as Commerce Department does in the international trade regulation cases with which counsel for Former Employees is familiar).

Of course, short of making *verbatim* records of its teleconferences with investigative sources

The thrust of the Government's response is that the Former Employees "do not allege that any of the statements in the summar[ies] [are] factually wrong," but only argue "in essence . . . that the information [in the summaries] is *incomplete*." *See* Def.'s Brief at 27-29. And, according to the Government, the Former Employees cannot claim to have been harmed, because "to the extent the investigator did not transcribe every aspect of the telephone conversation [with counsel for the Former Employees], there is no danger of misinterpreting plaintiffs' position because all of their letters were subsequently placed in the record." Def.'s Brief at 28.

The Government's argument completely misses the point. Counsel for the Former Employees are not concerned about omissions in the Labor Department's memoranda summarizing the agency's teleconferences *with them*. They are concerned that there may well be *similar* omissions – potentially significant omissions – from the agency's memoranda memorializing its teleconferences *with representatives of IBM and BP*. And those memoranda are the only evidence of the teleconferences between the agency and the representatives of IBM and BP that is available to the Former Employees and to the Court.

As the Government pointedly observes, there is no authority for the proposition that private parties are entitled to participate in the Labor Department's teleconferences with company representatives. *See* Def.'s Brief at 13, 21. But that simply underscores the agency's obligation to ensure that those teleconferences are fully and accurately memorialized – with appropriate detail and

---

(*see* n.54, *infra*), the Labor Department faces a challenge in documenting such teleconferences in an *efficient* fashion, while – at the same time – ensuring that the summaries it prepares are *fair*, *accurate*, and *complete*. But the agency's determinations can withstand judicial scrutiny only if the fundamental integrity of the agency's administrative record is beyond serious question.

nuance – for inclusion in the administrative record. In short, the written summaries prepared by the

agency investigator must be much more than mere *aides memoires* designed to later jog the

recollections of those who participate in teleconferences; instead, the summaries must also serve to

document all potentially relevant details of the conversations for the petitioning workers and the

Court, who are *not* parties to the teleconferences.

On remand, the Labor Department shall not rely on information contained in any of the

summary memoranda presently in the record, except to the extent that such information is expressly

and specifically confirmed in writing (or on audiotape) by a representative of BP, IBM, or the

Former Employees. Further, the agency shall take all measures necessary to ensure that future

teleconferences between the agency and other parties (particularly representatives of BP and IBM)

are fully and accurately preserved for the administrative record.[54]

---

[54]The means of documenting such teleconferences is left to the discretion of the Labor
Department. In lieu of preparing detailed summary memoranda, of course, the agency may tape
record its teleconferences, or allow counsel for the Former Employees to participate. However, even
if counsel for the Former Employees are included as participants, all teleconferences must be
memorialized for the administrative record in some reasonable fashion – whether by written
memorandum, audiotape, or other appropriate means – to provide a basis for judicial review.

As an aside, it is worth noting that most, if not all, of the Labor Department's summary
memoranda included in the record here fail to indicate the date on which those memoranda were
prepared, and – instead – state only the dates (and, in at least a couple of instances, the time) of the
subject teleconferences. *See*, *e.g.*, CSAR 742, 761, 852, 904, 993. But such memoranda cannot be
presumed to be accurate, complete, and free of bias unless their preparation was reasonably
contemporaneous with the teleconferences that they ostensibly document. *Cf.* Def.'s Brief at 27
(arguing that "Labor is not precluded from gathering information by telephone, and Labor
reasonably memorializes these conversations by transcribing the conversation by hand and
subsequently typing them [presumably, the handwritten notes] for placement in the record."). (The
disposition of the handwritten notes taken by agency personnel is unclear; they are not included in
the administrative record.)

b.  The Context of Questions Posed to Corporate Officials

Because control was a key issue to be evaluated in the remand proceeding, the Former Employees criticize the Labor Department for "ask[ing] questions about 'control' without ever defining the term." Pls.' Brief at 16. Thus, the Former Employees note, "Labor left it to the discretion of whomever was answering the questions to define this critical term." *Id.* As the Former Employees cautioned the Labor Department during the course of the remand proceeding,[55] absent a definition by the agency, "it was impossible for Labor to obtain reliable information [from respondents, including BP and IBM] that was based on the correct definition of control." Pls.' Brief at 7.

The Former Employees illustrate their point with several examples. *See generally* Pls.' Brief at 16-17. For example, in one questionnaire directed to IBM, the Labor Department asked a series of questions about control, introduced by a statement that "The following questions cover the issues of 'control' and 'joint employer.'" However, no definition of "control" was provided by the agency. *See* CSAR 782. Even more problematic are those instances when the Labor Department simply asked company officials who controlled the Former Employees. *See*, *e.g.*, CSAR 731 ("Who had control over the workers of the subject firm at IBM's Tulsa, OK location? Please explain the nature and extent of that control."); CSAR 812 ("What control does BP exercise over workers of IBM Corp. in Tulsa, OK?").[56]

―――――――――――――――――

[55]The Former Employees expressed their concerns during the course of the remand proceeding, both in phone conversations with the Labor Department and in a follow-up letter to the agency. *See* Pls.' Brief at 17; CSAR 996.

[56]The Former Employees also criticize the Labor Department for "ask[ing] leading questions of IBM and BP that were intended to derive information aimed at supporting a predetermined

The Government asserts that "at every stage in the investigation, Labor asked *multiple* questions as to various aspects of the respective roles of the companies that relate to the issue of operational control," and maintains that "the factual questions [asked by the agency] provided the necessary context."  Def.'s Brief at 22-23.

Unfortunately, although Labor Department personnel may have fully appreciated the "context" of the questions they posed, it is impossible to definitively say that representatives of BP and IBM necessarily would have done so.  Nor is it clear why the agency did not limit itself to "the factual questions" that the Government now emphasizes, to avoid the confusion that the Former Employees fear and to avoid any claim that the "ultimate question" as to "control" of the Former Employees was decided *not* by the Labor Department but instead by IBM and BP.  *Cf.* IBM I, 29 CIT at ____ n.33, 403 F. Supp. 2d at 1334 n.33 (emphasizing the importance of "the actual *facts* as to the practical realities of the exercise of day-to-day management and operational control over the Former Employees").

As the Government appears to acknowledge in its brief,[57] the Labor Department has been

outcome."  However, the Former Employees cite no examples of such questions.  *See* Pls.' Reply Brief at 2; *see also* Pls.' Brief at 6.  It is therefore unclear whether the "leading" questions at issue are the Labor Department's questions concerning "control" (discussed above), or whether the Former Employees are objecting to a different set of questions.

[57]The Government's Brief notes:

[I]n Former Employees of IBM Corp., Global Services Div., 387 F. Supp. 2d 1346, 1351-52 (2005), the Court rejected Labor's reliance upon the company's response that it did not produce an "article."  The Court reasoned that the term "article" had legal significance and, therefore, Labor could not incorporate the company's representation without making a factual inquiry, and that to do otherwise would constitute an improper substitution of the company's opinion for the agency's.  *Id.*

repeatedly chastised for its use of the types of conclusory questions that the Former Employees object to here, which may arguably – in effect – delegate to company officials the power to determine whether former employees are eligible for TAA benefits. *See generally* BMC, 30 CIT at ____, 454 F. Supp. 2d at 1228-29.[58] But "it is Labor's responsibility, not the responsibility of the company official, to determine whether a former employee is eligible for benefits." Former Employees of Federated Merch. Group v. United States, 29 CIT ____, ____, 2005 WL 290015 at * 6 (2005) (citation omitted). Indeed, IBM I warned the Labor Department about this very point. *See generally* IBM I, 29 CIT at ____ n.25, 403 F. Supp. 2d at 1331 & n.25.

On remand, the Labor Department's determination shall rely only on evidence that is consistent with the jurisprudence outlined above. Moreover, to the extent that any respondent uses the term "control," the agency shall not rely on that evidence unless the meaning of the term *as used by the respondent* is clear beyond doubt on the record (*e.g.*, if the agency obtains clarification of the use of the term).[59]

---

Def.'s Brief at 22.

[58]*See also*, *e.g.*, EDS I, 28 CIT at ____, 350 F. Supp. 2d at 1292-93 (in relying on company official's statement that company "did not produce articles, but provided computer related services," agency improperly "substituted one . . . employee's opinion that the company did not produce 'articles' for [the agency's] own legal inquiry"); Former Employees of Ericsson, Inc. v. U.S. Sec'y of Labor, 28 CIT ____, ____, 2004 WL 2491651 at * 7 (2004) (agency erred in relying on company official's 'essentially legal conclusion' that workers "[*did*] *not produce a product*!"); Ameriphone, 27 CIT at 1617, 288 F. Supp. 2d at 1359 (*citing* Former Employees of Marathon Ashland Pipeline LLC v. Chao, 26 CIT 739, 744-45, 215 F. Supp. 2d 1345, 1352-53 (2002) (agency's reliance on employer's conclusory assertions concerning 'production' constituted impermissible abdication of agency's duty to interpret TAA statute and to define terms used in it)).

[59]The Former Employees argue that the Labor Department's failure to affirmatively define "control" essentially "permitted BP and IBM to presume that control meant *exclusive* control," which is a standard "much stricter than the joint control [apparently] allowed for under Labor's new

c. <u>The Consideration of Countervailing Evidence</u>

Perhaps the most troubling aspect of the Third Negative Redetermination on Remand is the Labor Department's failure to even acknowledge – much less address – the significant body of record evidence that weighs against its negative determination. As the Court of Appeals has emphasized, "the substantial evidence standard requires more than mere assertion of evidence which in and of itself justified [the agency's determination], without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn. . . . Rather the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." <u>Gerald Metals</u>, 132 F.3d at 720.

Indeed, in reversing the Labor Department's prior determination in this matter, <u>IBM I</u> sought to impress upon the agency its obligation on remand to consider *the record as a whole* and to confront countervailing evidence:

_____

seven-factor control test." Pls.' Brief at 33 (emphasis added). The Former Employees contend that the effect of the agency's failure was to contaminate the entire record, because "it is now impossible for Labor to unwind the mistaken control concepts that BP and IBM were permitted to adhere to without any guidance" throughout the most recent remand proceeding. *Id*. The Former Employees argue that another remand therefore would be futile. *Id*.

The restrictions imposed above are designed to address the Former Employees' legitimate concerns. To that end, the Labor Department also shall ensure that, on remand, all contacts at BP and IBM are affirmatively and specifically advised in advance – before any information is solicited from them – that, for TAA purposes, there are degrees of control (in other words, that "control" does not necessarily mean "exclusive control," that it is possible for two companies to exercise "joint control," and that it is possible for employees to be "joint employees," etc. – or whatever it is that the relevant Labor Department standard recognizes). In addition, in reaching its determination on remand, the Labor Department would be well advised not to rely on any evidence previously obtained that is arguably "tainted" by potential confusion as to the meaning of "control." Following the remand, the Former Employees will be free to argue that a particular finding is unsupported by substantial evidence, because of such potential confusion.

> To be sure, it is not the role of the Court in reviewing the Labor Department's determinations to re-weigh the evidence and substitute its judgment for that of the agency. But the Court is charged with determining whether or not the agency's determination is supported by "substantial evidence" in the record. *See* 19 U.S.C. § 2395. That analysis necessarily requires a review of the evidence on which the agency relies *in the context of the entirety of the administrative record as a whole* (including "whatever in the record fairly detracts from" that evidence). . . . Thus, evidence that – standing alone – might otherwise constitute "substantial evidence" may not measure up where, for example, the agency has taken the evidence out of context, or where (as here) there is substantial contradictory evidence in the record that the agency has failed to address.

IBM I, 29 CIT at ____, 403 F. Supp. 2d at 1330-31 (*quoting* Gerald Metals, 132 F.3d at 720; Consol.

Bearings, 412 F.3d at 1269); *see also id*., 29 CIT at ____, 403 F. Supp. 2d at 1336-37 (ordering

agency – in reaching remand determination on "control" – to "ensure that its redetermination is

supported by substantial evidence, *taking into consideration all other evidence that fairly detracts*

*from its weight*") (citations omitted) (emphasis added).[60]

In its Third Negative Redetermination on Remand, the Labor Department ignored IBM I's

admonition. As the Former Employees succinctly put it, "for each of the seven factors of Labor's

new control test, Labor cherry-picked the record for evidence that supports its decision and did not

attempt to explain record evidence contrary to its position." Pls.' Reply Brief at 7; *see generally*

Pls.' Brief at 1, 31; Pls.' Reply Brief at 1, 6-8.[61]

_____

[60]*See also* IBM I, 29 CIT at ____, 403 F. Supp. 2d at 1324 (*citing* Gerald Metals and Consol. Bearings, and emphasizing that "the evidence on which the agency relies does not exist in a vacuum").

[61]*See also*, *e.g.*, Pls.' Brief at 20 (asserting that agency ignored various pieces of evidence related to BP's control of physical facilities of Former Employees' workplace), 21 (arguing that agency ignores evidence indicating that Former Employees' work activities were part of BP's core business functions, "presumably because [the evidence] was contrary to its predetermined conclusion"), 22 (stating that agency "ignored evidence contained in the Service Level Agreement"), 24 (arguing that, "in concluding that [BP] had no discretion over hiring, firing and discipline of

A determination that fails to take into account contradictory evidence – like the Third

Negative Redetermination on Remand here – cannot withstand scrutiny under the "substantial

---

workers, Labor blatantly ignored not only the provisions of the Outsourcing Agreement but also failed to consider the context of statements made by BP, IBM, and the Former Employees"), 24-26 (surveying relevant evidence, and asserting that, "in concluding that BP did not supervise the Former Employees' daily activities, Labor failed to 'tak[e] into account contradictory evidence or evidence from which conflicting inferences could be drawn'") (*quoting* Gerald Metals, 132 F.3d at 720), 28 (noting that "Labor failed to address evidence placed on the record by the Former Employees" which tends to contradict the agency's finding that they performed work on the open market), 29 (stating that "Labor reaches its conclusion [that IBM was responsible for matters such as establishing the Former Employees' wage rates] only after ignoring contradictory record evidence"), 29 (asserting that agency "fail[ed] to address contradictory record evidence" in concluding that BP did not train the Former Employees).

According to the Former Employees, the Labor Department's obligation to support its determinations with substantial evidence *based on the record as a whole* is properly viewed in the context of the remedial purpose of the TAA statute and the agency's obligation to act with the "utmost regard" for the interests of petitioning workers:

> Labor seemingly fails to recognize the remedial purpose of the statute in TAA cases. Not only must Labor support its determination with substantial evidence based on the whole record, including whatever in the record fairly detracts from the weight of the evidence, Labor must make its determination with the "utmost regard" for the petitioning workers. Former Employees of Chevron Prods. Co. v. United States Sec'y of Labor, 26 CIT 1272, 1274, 245 F. Supp. 2d 1312, 1318 (2002). In its third remand proceeding, rather than weighing record evidence with the utmost regard for the petitioning workers, Labor ignored evidence that fairly detracted from its negative determination. . . .[E]ven disregarding the remedial nature of the TAA statute (which is what Labor certainly did in this case), Labor's determination is unsupported by substantial evidence. *If Labor had properly accounted for the remedial nature of the statute, however, it would have weighed the record evidence and resolved any factual uncertainties in favor of the workers.* Thus, Labor's failure to take into account contradictory evidence is even more egregious when examined in light of the remedial purpose of the statute.

Pls.' Reply Brief at 7-8 (footnote omitted) (emphasis added).

evidence" standard.[62]  There is, of course, no requirement that an agency's written determination

dissect the record before it, adopting or explaining away each and every single piece of evidence,

one by one.  But the Labor Department must do much more than it has done in any of its

determinations to date in this case, to satisfy its obligations under Gerald Metals, 132 F.3d at 720,

and to provide a basis for judicial review.

---

[62]In the relatively few instances where it acknowledges evidence that weighs in favor of the Former Employees, the Labor Department tends to reflexively minimize or dismiss the evidence, asserting simply that it would be "typical of any service provider-client relationship."  *See*, *e.g.*, Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,713 ("As is normal in a service provider-client relationship . . . ," "in any service provider-client relationship . . . ," "where the relationship was that of client and independent service provider . . . ," "typical of what one might expect in a service provider-client relationship . . . ").

But the agency's mantra does not suffice to explain away the evidence, as a matter of logic or law.  As IBM I observed (contrary to the Labor Department's implication), there is no truth to the notion that a "service provider-client" relationship is somehow inherently incompatible with – and fundamentally different from – an "agency" relationship.  *See* IBM I, 29 CIT at ____ n.32, 403 F. Supp. 2d at 1334 n.32.  Thus, that a particular piece of evidence might be "typical of any service provider-client relationship" does not mean that it is inconsistent with an agency relationship. Indeed, many service provider-client relationships *are* agency relationships.  And many agency relationships have all (or at least most) of the indicia of a service provider-client relationship.  In a sense, the difference is a matter not of *kind* but of *degree*.

Further, if the new Leased Worker Policy on control is going to be the kind of line-drawing exercise that it appears it may be, it will not suffice for the Labor Department to tell workers (in effect), "No, *that's* not it, but try again.  We know it when we see it."  *Cf.* Jacobellis v. State of Ohio, 378 U.S. 184, 197 (1964) (Stewart, J., concurring) (noting, of obscenity, "I know it when I see it").  Admittedly, an analysis of control in a context such this is, by definition, "fact intensive," and necessarily requires that the agency "engage in a case-by-case analysis."  *See* IBM I, 29 CIT at ____, 403 F. Supp. 2d at 1333.  However, fundamental due process requires that the agency give prospective petitioning workers *some reasonable idea* of where the line is – what constitutes "enough."

3.  The Agency's Application of the Seven Criteria in This Case

Because the overarching methodological problems in the Labor Department's compilation

and analysis of the record, among other reasons, mandate remand of this matter once again, a

comprehensive, exacting, criterion-by-criterion "substantial evidence" review of the Third Negative

Redetermination on Remand is unnecessary.  The observations below may nevertheless inform the

remand proceeding, and advance the resolution of this case.

a.  The Location of the Former Employees

The first criterion for control set forth in the Labor Department's new Leased Worker Policy

is "[w]hether the subject workers were on-site or off-site of a facility of a production firm."  *See*

Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,712.

On remand, the Labor Department concluded that "the former IBM employees were not

located at a BP facility of any kind."  *Id*. at 10,713; *see generally* CSAR 1035-37.  The Labor

Department reasoned:

> The fact that IBM employees worked in the same location as they had when
> employed by BP and that BP maintained staff (*e.g.*, the BP Treasury unit) at the same
> street address where the former IBM employees had worked did not constitute co-
> location, because the IBM and BP facilities were completely separate, both
> physically (they were in different parts of the building) and functionally (for
> example, they had different telephone, computer and e-mail service).

Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,713.

To put it bluntly, the Labor Department's pinched, formalistic analysis verges on intellectual

dishonesty.  The agency's determination turns a blind eye to critical matters including the history

of the Former Employees' relationship with BP, the legal relationships between PwC/IBM and BP

at the time of the Former Employees' termination, the physical realities of the space at issue, and the seemingly obvious reason for the proximity of the offices of the two companies.

The Labor Department's analysis seems calculated to leave the impression that it is *pure happenstance* that IBM and BP at the time were (and perhaps still are) located in the same Tulsa office building. Nothing could be further from the truth.

It is undisputed that – in some cases for decades – the Former Employees were essentially "seated at the same desks, inside the same facility," throughout the time of their employment by BP, continuing through their outsourcing to PwC/IBM, and that they were "still sitting at the same desks in the same building doing the same work for the same company" at the time of their termination. *See* IBM I, 29 CIT at ____, 403 F. Supp. 2d at 1313. The Labor Department fails to explain why – when BP outsourced the Former Employees and their work to PwC/IBM – the Former Employees' location did not change (and why it did not change thereafter). In addition, the agency's analysis fails to acknowledge that not only did BP contract with IBM for the supply of services by the Former Employees (and other IBM personnel), but BP also *subleased* to IBM the physical premises where the Former Employees delivered the services. *See*, *e.g.*, CSAR 742.[63]

---

[63]The Labor Department's statement that the facilities of IBM and BP were "completely separate, . . . in different parts of the building" also appears to be a distortion of the facts. *Cf.* IBM I, 29 CIT at ____ & n.34, 403 F. Supp. 2d at 1334-35 & n.34 (taking agency to task for "spinning" information to obscure facts of this case, and cataloguing various other TAA cases in which agency has been criticized by courts for distorting and misrepresenting information to detriment of petitioning workers).

As a threshold matter, it is far from clear that – for purposes of ascertaining "control" – offices "in different parts of the [same] building" could ever be fairly characterized as "completely separate." It is not as though the offices of IBM and BP are on different coasts of the U.S., or even in different parts of the city of Tulsa. *Cf.* IBM I, 29 CIT at ____ n.47, 403 F. Supp. 2d at 1341 n.47

The Labor Department's analysis of this criterion similarly ignores the percentage of the IBM/Tulsa office's work that was devoted to BP, as well as the fact that the Former Employees worked exclusively for BP. *See*, *e.g.*, CSAR 735, 777-78, 800, 1047 (percentage of IBM's Tulsa workload devoted to BP); IBM I, 29 CIT at ____, 403 F. Supp. 2d at 1320 (Former Employees worked exclusively for BP).

Taken together, these undisputed facts constitute compelling circumstantial evidence that the location of the Former Employees was primarily for the convenience of BP,[64] and that the offices of the two companies were effectively "co-located." The Labor Department's tortured, form-over-substance analysis in the Third Negative Redetermination on Remand does nothing to dispel such a conclusion, and evinces a striking disregard for both the agency's obligation to act with the "utmost regard" for the interests of petitioning workers, and the remedial nature of the TAA statute.

---

(referring to fact that companies often have a number of different buildings on a corporate "campus"). Indeed, the record evidence indicates only that the offices of IBM and BP were *on different floors*. *See* CSAR 843. Further, there is no indication in the record that the offices of the Former Employees and other PwC/IBM personnel were any more physically distant from (*i.e.*, "separate from") the relevant BP offices *after* the outsourcing than they were *before* the outsourcing, when the Former Employees were employed directly by BP.

The numerous other relevant facts greatly diminish the significance of the Labor Department's finding of "different telephone, computer and e-mail service." *See* Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,713. Even so, the agency apparently overstates the case at least a bit on that finding too. *See*, *e.g.*, CSAR 812 (discussing operation of BP server).

[64]*See also* Third Negative Redetermination on Remand, CSAR 1045-46 (*quoting* CSAR 843) (indicating that convenience of BP was key factor in location of BP Treasury and certain other BP units in close proximity to offices of Former Employees and other relevant PwC/IBM personnel).

b. <u>The Nature of the Former Employees' Work</u>

The Labor Department's second newly-articulated criterion for control is "[w]hether the subject workers performed tasks that were part of the producing firm's core business functions, as opposed to independent, discrete projects that were not part of the producing firm's core business." *See* Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,712.

On remand, the Labor Department concluded that "[t]he former IBM workers performed tasks that were not part of BP's core business functions." *Id*. at 10,713; *see generally* CSAR 1037-38. The agency further stated:

> While undeniably important, the accounting services performed by the workers in question are not part of BP's core business activities of oil and gas exploration and production, petroleum refining and marketing, and petrochemicals production, and are exactly the kind of non-core activities that many production firms have successfully outsourced or have performed by independent firms.

Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,713.

It is unclear how the Labor Department could have determined that the Former Employees "performed tasks that were [not] part of the producing firm's core business functions," however, since the agency has made no finding on the nuts-and-bolts reality of the Former Employees' actual duties (instead characterizing them broadly as "accounting services"). In fact, record evidence indicates that the Former Employees' responsibilities included such tasks as "managing oil and gas production and related leases" for BP and "managing BP's production-related assets and equipment." *See* <u>IBM I</u>, 29 CIT at ____, 403 F. Supp. 2d at 1319-20 (citations omitted).[65]

_____

[65]Nor can the Former Employees' work for BP fairly be characterized as mere "discrete projects" for the company. *See* Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,712. The record indicates that, at the time of their termination, the Former Employees were still sitting

Instead of seeking a working understanding of the true nature of the Former Employees'

actual responsibilities and their real-world relationship to BP's "core business functions," the Labor

Department predicated the entirety of its analysis of this criterion (however brief) on such

"evidence" as quotes from a paid advertising section from *Business Week* magazine and other

general articles about outsourcing. *See generally* Third Negative Redetermination on Remand,

CSAR 1037-38; SAR 1001-02 ("Outsourcing the Finance Function," Finance Direct Europe), 1003-

08 (Special Advertising Section, "Outsourcing for Strategic Advantage," Business Week), 1009-11

("Savings Tip: Don't Do It Yourself," Business Week), 1012-16 ("Organizing for Performance:

How BP Did It," Stanford Business Magazine), 1017-18 ("BP Amoco and PricewaterhouseCoopers

Sign Canadian Outsourcing Contract," Alexander's Gas & Oil Connections). But information of

that nature, without more, does not constitute substantial evidence.

### c. Hiring, Firing, and Discipline of the Former Employees

The third criterion for control set forth in the Labor Department's new Leased Worker Policy

is "[w]hether the production firm has the discretion to hire, fire and discipline subject workers." *See*

Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,712. On remand, the Labor

Department found that "BP had no discretion to hire, fire or discipline the IBM workers," adding

that "[t]his finding . . . does not appear to be a matter of contention." *Id*. at 10,713.

---

at the same desks in the same building doing the same work for BP that they had been doing for years (and, in some cases, decades). *See generally* IBM I, 29 CIT at ____, ____, 403 F. Supp. 2d at 1313, 1319-20. Indeed, in its remand determination, the Labor Department notes that the Former Employees were previously employed directly by BP, and candidly concedes that "the outsourcing did not result in changes to their work assignments." *See* Third Negative Redetermination on Remand at 10,711.

To the contrary, the Former Employees vigorously dispute the agency's findings, maintaining that – "[a]lthough IBM was the principal employer of the Former Employees (*i.e.*, it cut their paychecks)" – BP retained a central role in personnel decisions. *See generally* Pls.' Brief at 22-24; *cf*. IBM I, 29 CIT at ____ n.21, 403 F. Supp. 2d at 1329 n.21 (noting previous instance in which Government boldly – and wrongly – claimed that Former Employees did not dispute a particular point).

The Labor Department's analysis of this criterion fails to address any of the Former Employees' major arguments. *See* Third Negative Redetermination on Remand, CSAR 1038-39. Nor does the agency address specific contractual provisions on point, or their real-life, practical implications for the Former Employees and others at PwC/IBM who worked exclusively on BP matters. *See*, *e.g.*, CSAR 895-97 (Art. 12.2.2 (detailing terms and conditions of PwC/IBM's employment of outsourced BP employees); Art. 12.4 (concerning removal of PwC/IBM workers from BP's account)); Pls.' Brief at 23 (emphasizing practical implications of contract provisions); CSAR 756 (concerning requests for reassignment of PwC/IBM employees from BP account). The Labor Department's finding on this criterion thus is not supported by substantial evidence. *See generally* section IV.D.2.c, *supra*.

### d. Supervision of the Former Employees' Daily Work Activities

The fourth of the Labor Department's seven new criteria for control is "[w]hether the production firm exercises the authority[66] to supervise the subject workers' daily work activities,

---

[66]The traditional formulation of this test focuses not on the *actual* exercise of authority, but – rather – on the *right* to exercise authority.

including assigning and managing work, and determining how, where, and when the work of individual workers takes place. Factors such as the hours of work, the selection of work, and the manner in which the work is to be performed by each individual are relevant." *See* Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,712 (footnote added).

On remand, the Labor Department concluded that "BP did not exercise the authority to supervise IBM workers' daily activities during the relevant period." *Id.* at 10,713; *see generally* CSAR 1039-46. According to the Labor Department:

> BP did not manage the individual IBM employees' work, nor did BP determine how, where, and when the work of the individual workers took place. Moreover, the investigation confirmed that while IBM personnel did interact with BP personnel to some degree, that interaction was limited and not managerial in nature. As is normal in a service provider-client relationship, BP outlined the work requirements, and IBM decided when, where, and who would do the work.

Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,713.

But, yet again, there is no indication in the record that the Labor Department considered "the elephant in the room" – the Former Employees' long history of service in the direct employ of BP. Even though the record makes it clear that continuity was one of BP's main concerns in the outsourcing, the Labor Department failed to consider the extent to which the Former Employees' day-to-day responsibilities were established while they were still employed directly by BP.

In addition, as with other criteria, the Labor Department here failed to take into account relevant contractual provisions and other significant evidence that contradicts its findings. *See generally* Pls.' Brief at 24-26; section IV.D.2.c, *supra*. Further, although the agency's analysis of this criterion is longer than its analysis of other criteria, it is no less superficial.

For example, the agency's finding that BP did not determine *where* the Former Employees

and their PwC/IBM colleagues did BP's work is – as a practical matter – in tension with a number

of the facts outlined in section IV.D.3.a (above), including the fact that BP sublet the office space

at issue to IBM, and the fact that BP located certain of its facilities in close physical proximity to

the Former Employees for BP's own convenience.  Those facts arguably constitute persuasive

circumstantial evidence that, in reality, BP strongly influenced "where . . . the work of the individual

workers took place."  *See* Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,713.[67]

The Labor Department's analysis also states that "the apparent fact that BP and IBM

personnel held regular meetings and corresponded by e-mail is not, in itself, indicative of 'control.'"

Third Negative Redetermination on Remand, CSAR 1043.[68]  But the relative frequency and the form

---

[67]The frequency and form of interactions between the Former Employees and BP personnel are similarly probative of BP's influence over both *where* and *when* its work was done.  Taken as a whole, the record facts belie any suggestion that the location and hours of the Former Employees were immaterial to BP, and that BP would have been just as happy to have the Former Employees and their PwC/IBM colleagues located in some far distant city.  The record suggests that the opportunity for relatively frequent face-to-face contact and proximity to units such as BP Treasury were important.  *See*, *e.g.*, SAR 843 (noting that BP Treasury was located in proximity to relevant PwC/IBM employees, for convenience of BP); CSAR 993-94 (location of BP Treasury driven by "the frequency of the interaction" with PwC/IBM personnel).

[68]Note 62 above observes that the Labor Department's determination tends to reflexively dismiss evidence that weighs in favor of a finding of control by characterizing the evidence as merely "typical of any service provider-client relationship."  As explained there, however, it is not enough to conclude that some behavior is "typical of any service provider-client relationship."  The fact that some behavior might be "typical of any service provider-client relationship" does not mean that it is not also indicative of "agency," and thus supportive of a finding of "control."  The issue is less a matter of the nature of behavior or conduct, and more a matter of degree.  Here, and elsewhere, the Labor Department repeatedly fails to consider the *extent* or *degree* of the behavior in question, in order to reach a reasoned determination as to whether or not it warrants a finding of control.

Similarly, in the finding quoted above, the Labor Department concluded that certain behavior (*i.e.*, holding regular meetings and corresponding by e-mail) is not "in itself" indicative of control.  However, the question is not whether any single piece of evidence alone indicates control, but –

of such contact might well be probative. It might well be significant, for instance, if the Former

Employees and their contacts in the BP Treasury met and otherwise communicated with the same

frequency *after* the outsourcing as they did *before* – just as it might well be significant whether those

communications were of a frequency and/or form to distinguish them from PwC/IBM's

communications with the firm's other "clients." However, the record gives no indication that the

Labor Department considered whether the Former Employees' outsourcing had any impact on the

frequency and form of the communications they had with their contacts at BP, or whether life post-

outsourcing was just "business as usual."[69]

The frequency and form of contact between the Former Employees and BP might bear as

well on BP's influence over *how* its work was done. Similarly, the fact that the Former Employees

were previously employed directly by BP (in some cases, for decades) is not irrelevant, because it

effectively ensured (at least to some degree) how BP's work would be done. The Labor Department

gave no consideration to these points either.

The Labor Department's analysis of this criterion did address the fact that the Former

_____

rather – whether all the evidence taken as a whole does so. Logically, if the Labor Department proceeds to dismiss each piece of potentially significant evidence as insufficient "in itself," then – by definition – the agency cannot ever possibly find that BP exercised operational control over the Former Employees at the time of their termination.

[69]In some types of "leased worker" cases, it may be difficult for the Labor Department to gauge what constitutes a run-of-the-mill service provider-client relationship and what constitutes something more. In the case at bar, however, the norms of the Former Employees' direct employment by BP provide a "baseline." If (as to this criterion, and others) the Former Employees can establish that – as a practical matter – their experience post-outsourcing was little different from their experience while they were in the direct employ of BP, that would seem to constitute persuasive evidence that their post-outsourcing relationship with BP was no mere service provider-client relationship.

Employees were instructed to identify themselves as IBM employees acting on behalf of BP.  *See*

Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,713; CSAR 1044-45.  But the

agency emphasizes that the instruction was to ensure that the former BP employees did not continue

to represent themselves as BP employees.  *Id*.  But the agency's analysis misses the two most

important points.  First, the Former Employees' duties post-outsourcing were not limited to internal

contacts; to the contrary, the Former Employees continued to represent BP's interests vis-a-vis third

parties, just as they had done before the outsourcing.  And, second, the instructions given to the

Former Employees did not direct them to introduce themselves simply as IBM employees.  Rather,

they were instructed to introduce themselves as IBM employees *acting on behalf of BP*.  *See* CSAR

817.

For these reasons, and others, the Labor Department's findings on BP's role vis-a-vis the

day-to-day work of the Former Employees cannot be sustained on the existing record.

### e.  The Exclusivity of the Former Employees' Work for BP

The fifth criterion for control set forth in the Labor Department's new Leased Worker Policy

is "[w]hether the services of the worker group have been offered on the open marked (*e.g.*, do

workers of the subject group perform work that supports other clients?)."  *See* Third Negative

Redetermination on Remand, 71 Fed. Reg. at 10,712.

On remand, the Labor Department concluded that "the services performed by IBM workers

were performed for clients other than BP."  *Id*. at 10,713-14; *see generally* CSAR 1046-47.  The

agency acknowledged that "[t]he petitioners themselves may have worked only for BP," but stated

that "this is not the case for the entire worker group."  *Id*. at 10,714.

However, the Labor Department failed to explain the relevance of its reference to "the entire worker group" – which, read in context, apparently means all IBM workers at the Tulsa facility at the time of the Former Employees' termination (including those who were not terminated). It is not clear why the agency's focus extends beyond the work done by the Former Employees and other members of the petitioning worker group. And there seems to be no dispute that the petitioning Former Employees worked solely on BP matters.[70]

The only other piece of evidence that the Labor Department relied on in reaching its

---

[70]The Government states that "the relevant question is whether the separated workers . . . were exclusively working on the BP account." *See* Def.'s Brief at 55. But the point of the Government's argument is not clear. Surely neither the Government nor the Labor Department contends that *all* of the separated workers must have worked *only* for BP. Surely they do not contend that, if even a mere handful of the separated workers once did a few hours' work for a client other than BP, the agency would be entitled to find against certification of the petitioning workers as to this criterion.

At least at first blush, it would seem to be very difficult to reconcile such an extreme interpretation with the remedial purpose of the statute – as well as agency practice on other similar issues of interpretation. Thus, for example, when the Labor Department certifies worker groups, it does not first conduct a worker-by-worker investigation into the bases for each individual's termination. It is likely that in many – if not most – cases, at least some individuals terminated within the period at issue were terminated for performance issues or other non-trade related reasons. Yet that fact does not serve to preclude certification of the worker group; indeed, it doesn't even preclude an award of TAA benefits to individual workers who were terminated for non-trade related reasons.

In any event, as noted above, it appears to be undisputed that the representative Former Employees worked exclusively on BP matters. Moreover, the agency determination here under review includes no finding as to whether any of the other potentially certifiable former employees did any work for companies other than BP. *Cf.* IBM I, 29 CIT at ____ n.35, 403 F. Supp. 2d at 1335 n.35 (noting that "there is no evidence in the record . . . that *any* of the *displaced* IBM workers were among those who did work for companies in addition to BP"). Indeed, the only concrete evidence on point suggests that the vast majority of the PwC/IBM employees terminated in the relevant period were then working solely on BP matters. *See* CSAR 780.

determination on this criterion was cited to support the proposition that it is "quite clear" that

PwC/IBM was free to reassign its employees away from BP's account at any time. *See* Third

Negative Redetermination on Remand, CSAR 1047. However, the agency fails to address relevant

contractual provisions and other contrary evidence on point. *See*, *e.g.* CSAR 896 (contract provision

concerning removal of certain PwC/IBM personnel assigned to BP's account); *see generally* Pls.'

Brief at 26-28. Nor does the agency address the actual course of conduct of PwC/IBM and BP in

the implementation of their contract – that is, the extent to which PwC/IBM employees who worked

on BP's account in fact did (or did not) do work for other companies as well.

Like its findings on the other criteria, the Labor Department's findings on this criterion also

fail the substantial evidence test.

### f. The Wages Paid to the Former Employees

The Labor Department's sixth criterion is "[w]hether the production firm has been

responsible for establishing wage rates and the payment of salaries to individual workers of the

subject worker group." *See* Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,712.

On remand, the Labor Department concluded that "BP was not responsible for establishing wage

rates or paying salaries to individual IBM workers." *Id*. at 10,714. The Labor Department further

stated:

> This issue does not appear to be a matter of contention. The petitioners have
> indicated that PwC/IBM, not BP, set their wage rates and paid their salaries, once
> they were outsourced.

Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,714.

However, contrary to the Labor Department's assertion, the Former Employees in fact *do*

dispute the agency's finding on this criterion. The Former Employees maintain that, although IBM cut their paychecks, BP retained a certain degree of control over personnel matters even after the Former Employees' outsourcing, and played a significant role in their performance reviews and in determining their compensation (including salary as well as bonuses). *See generally* Pls.' Brief at 28-29. Indeed, there are relevant contractual provisions and other record evidence that tend to support the Former Employees' claims; but the agency once again simply ignored it. *See*, *e.g.*, CSAR 895 (Art. 12.2.2, concerning salaries and benefits); Pls.' Brief at 28-29 (and evidence cited therein).

### g. Training of the Former Employees

The seventh – and final – criterion for control set forth in the Labor Department's new Leased Worker Policy is "[w]hether the production firm has provided skills training to subject workers." *See* Third Negative Redetermination on Remand, 71 Fed. Reg. at 10,712.

The Labor Department concluded on remand that "BP did not provide skills training to the workers of IBM." *Id*. at 10,714. That conclusion rested, in turn, on two findings – a finding that BP provided no training to the Former Employees, and a finding of "evidence that PwC/IBM provided training" to them. *See* Third Negative Redetermination on Remand, CSAR 1048-49. But neither finding can be sustained on the existing record.

The evidence cited to support the Labor Department's first finding strains credulity. *See* Third Negative Redetermination on Remand, CSAR 1048 (*citing* CSAR 777; SAR 844). It would be inherently incredible for BP to claim that it provided no skills training whatsoever to the outsourced workers even during the years that they were directly in BP's employ – in some cases,

for decades. And the Former Employees were retained after the outsourcing precisely because they already possessed the knowledge and the skill set needed to understand the requirements of BP's business. *See* CSAR 777. In making its finding, the Labor Department thus ignored both common sense and record evidence explaining *why* BP provided no training to the Former Employees and their colleagues after they were outsourced to IBM.

The relevance of the Labor Department's second finding – that PwC/IBM provided training to the outsourced workers – is in doubt.[71] But, in any event, like the agency's first finding, this second finding too is unsupported by the existing record. The sole evidence cited is a very basic PwC handout addressing"Frequently Asked Questions," apparently prepared for the BP employees who were being outsourced to PwC. *See* Third Negative Redetermination on Remand, CSAR 1048-49 (*citing* SAR 69). It simply cannot bear the weight of the agency's finding.

In short, as the examples above illustrate, the Labor Department's findings applying its seven newly-announced criteria for control to the facts of this case are not supported by substantial evidence in the record. Therefore, even leaving aside the numerous other deficiencies in the agency's Third Negative Redetermination on Remand, that determination could not be sustained.

E. The Agency's Failure to Make Determinations on Other Criteria for Certification

As discussed elsewhere above, the Third Negative Redetermination on Remand includes no

---

[71]Contrary to the Labor Department's implication, there is no apparent reason why, as a matter of pure logic – even if PwC/IBM *did* provide training for them – the PwC/IBM workers might not also have received training from BP. As discussed above, however, the record evidence as a whole suggests that the knowledge and experience that the outsourced workers acquired while in the direct employ of BP ensured that they already had the skills needed to do the work that BP continued to require of them, rendering further training unnecessary.

formal findings by the Labor Department on any criteria for certification of leased workers other than control, notwithstanding the Court's express directive to the contrary in IBM I, and the sound policy and practical reasons underpinning that directive. *See* IBM I, 29 CIT at ____, 403 F. Supp. 2d at 1347 (instructing agency to "make determinations as to whether each of the criteria [for certification of leased workers] is satisfied in this case"); n.39, *supra* (explaining that IBM I directive requiring agency to make determinations on all criteria was intended to avoid "ping-pong" phenomenon, where TAA case repeatedly bounces back and forth between agency and court as result of agency's typical piecemeal approach to TAA investigations).

The Former Employees initially sought to interpret the absence of agency findings on other certification criteria to mean that their satisfaction of those criteria was not disputed. *See* Pls.' Brief at 31-32 (caption of section of brief); *see also id.* at 3, 34-36; Pls.' Reply Brief at 1, 8-9, 11. The Government quickly disabused the Former Employees of that notion. *See* Def.'s Brief at 14, 61-63. But the Government never even acknowledged – much less tried to explain – the Labor Department's wholesale failure to make the findings that IBM I expressly required.

Instead, in the words of the Former Employees, the Government "embarks on an analysis of the record evidence in an effort to demonstrate that the remaining statutory criteria for certification have not been satisfied" – focusing, in particular, on the requirement for a "causal nexus" between workers' separation and either increased imports or a shift in production. *See* Pls.' Reply Brief at 8-9; Def.'s Brief at 14, 61-63 (*citing*, *inter alia*, Former Employees of Hewlett-Packard Co. v. United States, 17 CIT 980, 985 (1993)). But the arguments of litigation counsel are no substitute for the Labor Department's own reasoned analysis on the record. The Government's

attempts at "backfill" must therefore be rejected as flagrant *post hoc* rationale.  *See*, *e.g.*, Burlington

Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69 (1962) (agency action must "be upheld, if

at all, on the same basis articulated by the agency itself").[72]

---

[72]As explained above, the Third Negative Redetermination on Remand's two brief, off-hand references to the reasons for the Former Employees' termination do not constitute formal findings by the Labor Department.  *See* section II.B.7, *supra*.  Among other things, the agency's remand determination is utterly devoid of any analysis of the relevant evidence of record.

Moreover, even if the Labor Department had made a negative determination on "causal nexus" on remand, and even if the agency had sought to support that determination by itself articulating the analysis set forth in the Government's brief, it still would not pass muster, for several reasons.

First, and most importantly, in reaching its determinations, the Labor Department is obligated to take into consideration *all* record evidence, including that which weighs against the agency's conclusion.  *See*, *e.g.*, CSAR 736 (IBM's response to question 16); SAR 913 (stating that Former Employees "were originally outsourced by BP as a cost-saving measure and . . . were eventually terminated because BP continued to require cost savings as a result of increased imports of oil and natural gas that competed with BP's U.S. production (and ultimately led to shifts in production)"); *see generally* section IV.D.2.C, *supra*.  The Government's analysis here fails to do so.  *See* Def.'s Brief at 61-63.

Further, the evidence cited by the Government as support for a negative determination on causation is largely conclusory, and thus does not merit  great weight.  *See generally* Def.'s Brief at 61-63.  Mere denials have little probative value.  And corporate double-speak is also virtually worthless.  *See*, *e.g.*, CSAR 723-24, 761-62 (*cited in* Def.'s Brief at 61-62).  In BMC, for example, when asked to "[b]riefly explain the circumstances related to separations at [BMC], the company responded simply that the company had taken "significant restructuring actions, including reductions in force, to reduce its ongoing operational expenses to be in line with the revenue that [was then] currently being generated."  *See generally* BMC, 30 CIT at _____, 454 F. Supp. 2d at 1326-27 (citation omitted).  The Labor Department was castigated for making "no effort whatsoever to plumb the meaning of [the company's] wholly uninformative response" to the agency's question.  *Id*.  As BMC observed:

> BMC's response to the Labor Department's question . . . was little more than a tautology, not illuminating in the least. . . . In essence, BMC responded that the company laid off workers to reduce expenses, so that expenses would not exceed revenues.  But it is a virtual truism that companies strive to ensure that expenses do

The Labor Department is once again instructed, on remand, to make determinations on all

applicable criteria for certification of Former Employees. Judgement is reserved as to the

---

not exceed revenues, and that laying off workers reduces expenses. For purposes of
a TAA analysis, the salient question is "why?": Why were [BMC's] revenues down?
For example, were lower revenues attributable in part to increased imports?

BMC, 30 CIT at _____ n.32, 454 F. Supp. 2d at 1326-27 n.32.

So, too, the Labor Department cannot content itself here with bland assertions by corporate
officials that lay-offs were simply the result of "rebalanced" staffing, or "restructuring" designed
to "improve . . . services . . . at a better cost." And it is mere tautology to say that "changes in
staffing levels were due to a reduction in the finance and accounting staff" or that "workers lost
employment due to a reduction in the number of finance and accounting personnel." *See* Third
Negative Redetermination on Remand, 71 Fed. Reg. at 10,711 n.3; CSAR 723-24, 761-62 (*cited in*
Def.'s Brief at 61-62).

Finally, there is a distinctly hollow ring to the Government's criticisms of the Former
Employees' evidence tying their termination either to increased imports or to a shift in production.
*See* Def.'s Brief at 62. It is true that petitioning workers bear the burden of proof on their claim.
But it is equally true that the TAA statute implicitly recognizes that the Labor Department has
expertise and resources (not to mention subpoena power) that petitioning workers do not. The
agency is thus "charged with an *affirmative* obligation to *proactively* and thoroughly investigate all
TAA claims filed with the agency – and, in the words of its own regulations, to 'marshal all relevant
facts' to make its determinations." BMC, 30 CIT at _____, 454 F. Supp. 2d at 1357 (*citing* 29 C.F.R.
§ 90.12); *see generally id.*, 30 CIT at _____, 454 F. Supp. 2d at 1355-57. The Labor Department's
obligation to act with the "utmost regard" for the interests of the Former Employees is in no way
diminished by the fact that they are now represented by counsel.

To date, the Labor Department has largely failed to look behind the broad, generalized
assertions of BP and IBM. Similarly, the agency has apparently failed to consider the possible
motives and incentives that might bear on the companies' credibility (especially on this issue). *See*
section IV.D.2.a(2), *supra*. Nor has the agency posed the obvious threshold questions point-blank,
or confronted the companies with hard data concerning matters such as increased import levels and
shifts in production. *See*, *e.g.*, CSAR 951 (summarizing certain data concerning increased imports
of oil and natural gas, as well as data on shifts in production).

As things stand now, the Labor Department is derelict in its duty to investigate whether
international trade was a factor in the Former Employees' termination; and the existing evidentiary
record is simply insufficient to support a negative determination on that issue.

consequences of the agency's failure to comply with this and other instructions set forth in IBM I.

*See* Anderson v. U.S. Sec'y of Agriculture, 30 CIT ____, ____, 469 F. Supp. 2d 1300, 1301 (2006) (ordering agency to show cause under Rule 11 for failure to comply with remand instructions in Ag-TAA case).

### F. The Remedy of Last Resort

Particularly in light of the Labor Department's failure to make findings on certification criteria other than control, the Former Employees make out a compelling case for court-ordered certification. *See generally* Pls.' Brief at 32-35; Pls.' Reply Brief at 9-10.

The Former Employees argue that there is ample evidence in the administrative record demonstrating that they satisfy all applicable criteria, and that the record thus supports certification. *See*, *e.g.*, Pls.' Brief at 31-32, 34.

They reiterate that the Labor Department's criteria for certification have been "a constantly moving target," and posit that there is no reason to believe that – in a fourth remand proceeding – the Labor Department will not simply change the rules once again, "continuing to make it impossible for the Former Employees to demonstrate their eligibility for certification." Pls.' Brief at 17-18. They contend that another remand will be futile, because the Labor Department "poisoned the well" in the most recent remand investigation by failing to take necessary measures to ensure the reliability of evidence collected on remand (*see* section IV.D.2.a(1), *supra*), and by failing to put its questions into proper context by defining "control" for BP and IBM (*see* section IV.D.2.b, *supra*).

*See* Pls.' Reply Brief at 10; Pls.' Brief at 33.[73]

They emphasize that continued delay in their receipt of TAA benefits diminishes the usefulness of those benefits. Pls.' Reply Brief at 10. They point out that the Labor Department "has now had four opportunities to develop and review the record" in this matter, and therefore "does not deserve another, fifth bite at the apple." Pls.' Brief at 33; Pls.' Reply Brief at 10. And they note that IBM I affirmatively put the Labor Department on notice that it was being allowed only "one last, very brief, remand." Pls.' Brief at 32-33; Pls.' Reply Brief at 9 (*quoting* IBM I, 29 CIT at ____, 403 F. Supp. 2d at 1347). In short, according to the Former Employees, "[t]he time has come for the Court to order that Labor certify the Former Employees as eligible to receive TAA." Pls.' Brief at 1.

But, pointing to the language of the statute, the Government continues to insist that the Court lacks the power to order the Labor Department to certify workers in TAA cases. *See* Def.'s Brief at 14, 63-65. And there is at least some authority for that proposition. *See* Merrill Corp., 31 CIT at ____, Slip Op. 07-46 at 29 (Mar. 28, 2007) ("Even if Plaintiffs have satisfied all of the eligibility requirements for TAA certification under the Trade Act, this Court is powerless to direct Labor to certify Plaintiffs as eligible for TAA. The Trade Act is clear. This Court may affirm Labor's determination or it may set aside Labor's determination in whole or in part, 19 U.S.C. § 2395(c), but this Court is not authorized to direct Labor to certify Plaintiffs as eligible for TAA . . .").

As explained above (*see* note 32), the Court of Appeals thus far has side-stepped this issue.

---

[73]The Former Employees fear that, as a result of the agency's actions, it will now "be impossible for Labor to obtain information from the parties involved in this case that [does] not reflect the parties' previous, tainted positions." Pls.' Reply Brief at 10; *see also* Pls.' Brief at 33.

*See* <u>Marathon Ashland</u>, 370 F.3d at 1386 (finding, under the circumstances, "no occasion to address the government's argument that the remedy ordered by the [Court of International Trade] was outside [its] authority"); <u>Barry Callebaut</u>, 357 F.3d at 1383 (deeming moot "the question of the Court of International Trade's authority to order Labor to certify [workers]" for TAA benefits). But a careful reading of the relevant precedent suggests that, if a case of court-ordered certification is to have any shot at surviving on appeal, it must be a clear-cut case where another remand would be plainly futile. *Cf.* <u>Nippon Steel Corp.</u>, 458 F.3d at 1359. Though it may be close, this is not (yet) that case.

### V. <u>Conclusion</u>

For all the reasons set forth above, the Labor Department's Third Negative Redetermination on Remand cannot be sustained. Accordingly, out of an abundance of caution and in an exercise of restraint, this action is remanded to Defendant once again, for further proceedings not inconsistent with this opinion.

A separate order will enter accordingly.

/s/
_____
Delissa A. Ridgway
Judge

Dated:  March 30, 2007
      New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

FORMER EMPLOYEES OF INTERNATIONAL :
    BUSINESS MACHINES CORPORATION,
                                     :
                *Plaintiffs*,
                                     :      Court No. 04-00079
            v.
                                     :
U.S. SECRETARY OF LABOR,
                                     :
                *Defendant.*
                                     :

# ORDER

Upon consideration of the U.S. Department of Labor's Third Negative Redetermination on Remand, 71 Fed. Reg. 10,709 (March 2, 2006), Plaintiffs' Comments thereon, Defendant's response, and Plaintiffs' reply, and in accordance with the Court's opinion issued this day in this matter, it is hereby

ORDERED that this action is remanded to Defendant for further proceedings not inconsistent with the opinion of the Court; and it is further

ORDERED that judgement is reserved as to the consequences of Defendant's failure to comply with the instructions of the Court in Former Employees of Int'l Business Mach. Corp., 29 CIT ____, 403 F. Supp. 2d 1311 (2005); and it is further

ORDERED that the parties shall confer with one another, and – no later than April 9, 2007 – Defendant shall notify the Court of several alternative, mutually-convenient dates and times in the week of April 23, 2007 when all counsel (including counsel at the Department of Labor) are available to appear before the Court at a hearing to be convened to discuss the schedule and structure of the remand proceeding in this matter.

                                     /s/
                                _____
                                Delissa A. Ridgway, Judge

Dated: March 30, 2007
       New York, New York